617 A.2d 656

TOWNSHIP OF HOLMDEL, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT-APPELLANT.

Argued September 30, 1992—Decided December 3, 1992.

*Mary R. Hamill,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Frederick W. Rose* argued the cause for respondent (*Young, Rose, Imbriaco & Burke,* attorneys; *Mr. Rose, Gianfranco A. Pietrafesa,* and *J. Andrew Kinsey,* on the brief).

PER CURIAM.

The judgment is affirmed, substantially for the reasons expressed in the opinion of the Appellate Division, reported at 12 *N.J.Tax* 112 (1991).

STEIN, J., concurring.

Although joining in the Court's affirmance of the judgment below, I am much less confident than was the Appellate Division that the "articulated objective" of the legislation under scrutiny can be discerned simply from an examination of "its very terms." *Township of Holmdel v. Director, Div. of Taxation,* 12 *N.J.Tax* 112, 117 (1991). In this era of spartan State budgets and sagging State revenues, we might at least pause to reveal the vulnerable aspect of Holmdel's claim to nearly $4

million of the State's premium-tax revenue. In the process, the Legislature may be persuaded that the "plain" meaning of *L.* 1983, *c.* 390, *N.J.S.A.* 54:18A–1a(b), is not so plain after all, a conclusion that could provoke reconsideration of existing or future appropriations authorizing payment of the amounts claimed by Holmdel. See *City of Camden v. Byrne*, 82 *N.J.* 133, 150, 411 *A.*2d 462 (1980).

Holmdel's claims against the State emanate from the provisions of the insurance company franchise tax, *L.* 1952, *c.* 227, *N.J.S.A.* 54:16A–1 to –12 (repealed *L.* 1981, *c.* 183), pursuant to which domestic insurance companies paid a franchise tax calculated on the basis of premium income primarily to the municipality, and the balance to the county, in which the company's principal office was located. Domestic insurance companies liable for the franchise tax were subject as well to the general premium tax, *N.J.S.A.* 54:18A–1 and –2, payable directly to the State, at rates essentially equal to the rate of the franchise tax, and the franchise tax was deductible from the premium tax. Accordingly, the pre–1981 statutory scheme was that "foreign" insurance companies, those incorporated in other states but doing business in New Jersey, paid their premium tax to the State and paid no franchise tax. Domestic insurance companies, although subject to the premium tax collected by the State, satisfied their premium-tax liability by paying the franchise tax directly to the municipality and county in which their principal offices were located.

Prudential Property & Casualty Insurance Company (Prupac) was incorporated in New Jersey in 1975, and its principal office, originally located in Woodbridge, was relocated to Holmdel in 1977. Accordingly, Prupac paid the municipal share of its franchise tax directly to Holmdel.

When the Legislature repealed the franchise tax in 1981, *L.* 1981, *c.* 183, domestic insurance companies could no longer offset their liability for premium taxes with franchise-tax deductions, and they therefore commenced payment of premium

taxes directly to the State. In one respect, however, the repeal was illusory because the statute that repealed the tax provided that the State would continue to pay to the municipalities and counties in which the principal office of domestic insurance companies had been located the same amounts they would have received had the tax remained in force. The apparent purpose of the repealer, according to the Sponsor's Statement and the press release from the Governor's Office when the bill was signed, was to balance the fiscal year 1982 budget by enhancing State revenues from premium taxes payable on March 1st of each year, and postponing until August 1st of the ensuing fiscal year the date for remittance of the equivalent amounts due to municipalities and counties. See Sponsor's Statement to A–3404; Press Release, June 19, 1981, Office of the Governor, accompanying A–3472 and A–3404. Thus, the practical effect of the repealer was merely to interpose the State as a collection agent for the municipalities and counties that previously had collected the franchise tax, authorizing the State's collection of the tax (March 1st) and its remittance to municipalities and counties (August 1st) to straddle two fiscal years. Another consequence of the repealer was to "sunset" the benefits of the franchise tax, limiting the State's payments replacing the franchise tax revenues to only those municipalities and counties in which domestic insurance companies had located their principal offices on or before January 1, 1981. *N.J.S.A.* 54:18A–1a(a). The statute states explicitly that the annual payments to municipalities and counties are intended "[t]o ensure that no county or municipality will experience a loss of revenue as a result of the repeal of the franchise tax on domestic insurance companies." *Ibid.*

From 1981 to 1987, Holmdel continued to receive payments directly from the State in amounts equal to what Prupac would have paid Holmdel under the franchise tax. During 1987, however, Prupac sought and received approval from the New Jersey Commissioner of Insurance to surrender its New Jersey domestic certificate of authority for a New Jersey foreign

certificate of authority, becoming an Indiana-domiciled insurance company with its principal office in Indiana, and operating in New Jersey through a newly-formed and wholly-owned subsidiary. In 1988 the State made no "in lieu" franchise-tax payment to Holmdel on the basis that had the franchise tax not been repealed, Prupac would not have been subject to the tax as a foreign insurance company. Holmdel maintains that it is entitled to phase-out payments pursuant to *L.* 1983, *c.* 390, codified at *N.J.S.A.* 54:18A–1a(b), which provides:

> To ensure that no municipality will experience an abrupt loss of revenue as a result of a domestic insurance company relocating its principal office from the municipality wherein it was established on January 1, 1981, the State Treasurer, upon warrant of the State Comptroller, shall, on or before August 1 of each year, pay to the collector of the municipality from which the principal office was removed, an amount as hereinafter provided:
>
> (1) For the first year after relocation, an amount equal to 80% of the amount the municipality received in the year in which the relocation occurred;
>
> (2) For the second year after relocation, an amount equal to 60% of the amount the municipality received in the year in which the relocation occurred;
>
> (3) For the third year after relocation, an amount equal to 40% of the amount the municipality received in the year in which the relocation occurred;
>
> (4) For the fourth year after relocation, an amount equal to 30% of the amount the municipality received in the year in which the relocation occurred; and
>
> (5) For the fifth year after relocation, an amount equal to 15% of the amount the municipality received in the year in which the relocation occurred.
>
> No municipality shall be entitled to any payment under this subsection for any year following the fifth year after relocation.

Holmdel contends that the plain language of the 1983 amendment authorizes phase-out payments to any municipality from which a domestic insurance company relocates a principal office that had existed on or before January 1, 1981. Although acknowledging that *N.J.S.A.* 54:18A–1a(b), read literally, entitles Holmdel to phase-out payments, the State contends that the statutory context in which the 1983 amendment was adopted demonstrates that its benefits were limited to only municipalities that were entitled to franchise-tax-replacement payments because of the repeal of the franchise tax. The State asserts that when Prupac became domesticated in Indiana, Holmdel's entitlement to "in lieu" payments ceased because Prupac would

no longer have had any franchise-tax liability to Holmdel even if the franchise tax were still in force. The State observes that "in lieu" payments were authorized "[t]o ensure that no * * * municipality will experience a loss of revenue as a result of the repeal of the franchise tax on domestic insurance companies * * *," and that Holmdel's loss of revenue was caused not by repeal of the franchise tax but by Prupac's redomestication in Indiana.

Both Holmdel and the State rely on aspects of the legislative history of *L.* 1983, *c.* 390, indicating that its enactment was prompted by the pending relocation of Chubb & Sons, a domestic insurance company, from Millburn to Warren Township, resulting in a loss of franchise-tax "in-lieu" payments approximating $1.5 million annually. The State contends that Millburn's plight reveals a legislative purpose to limit the five-year phase-out payments to only instances in which a domestic insurance company relocates to another New Jersey municipality. Holmdel asserts that even if Millburn's potential revenue loss triggered the 1983 amendment, neither the statute nor the legislative history reveals a legislative purpose to deny phase-out payments because the insurance company relocates its principal office to another state. The Appellate Division rejected the State's contention and construed the statute in accordance with its plain meaning:

> We recognize that the original purpose of the Legislature in enacting *N.J.S.A.* 54:18A–1a was to protect municipalities from a shortfall in revenues resulting from the repeal of the franchise tax. However, the Legislature's focus shifted in 1983 when it enacted *N.J.S.A.* 54:18A–1a(b). The legislative concern was not to replace funds lost by reason of the abolition of the franchise tax. Rather, the legislative purpose was to counteract the harsh financial impact of an insurance company's relocation of its principal office from a municipality. By its very terms, the statute's articulated objective was "[t]o ensure that no municipality will experience an abrupt loss of revenue *as a result of a domestic insurance company relocating its principal office* * * *." [Emphasis supplied].

> \*      \*      \*      \*      \*      \*      \*      \*

> To adopt the Director's reasoning would lead to the conclusion that a municipality is entitled to the benefit of phaseout payments only if it would have received

the franchise tax if it were still in existence. That position is neither logical nor sustainable. If the franchise tax were still in existence, a municipality would lose its benefit upon an insurance company's relocation from its borders, whether or not it "redomesticated" in another state.

[12 *N.J.Tax* at 117–18.]

On its face, the Appellate Division's reasoning appears persuasive. From the standpoint of the municipality that loses franchise-tax "in-lieu" payments because a domestic insurance company relocates its principal office, the loss is equally burdensome whether the relocation is to New Jersey or an out-of-state location. Because the 1983 legislation states its objectives broadly enough to embrace both in-state and out-of-state principal office relocations, the Appellate Division was unwilling to adopt a construction more restrictive than the statute's plain meaning.

Approached from a different perspective, however, the statutory context in which the 1983 amendment was adopted might suggest, contrary to that amendment's plain meaning, either (1) that the Legislature, aware that "in lieu" payments were intended only to avoid revenue losses occasioned by repeal of the franchise tax, never intended that phase-out payments would be triggered by a redomestication to another state, or (2) that the Legislature, focusing primarily on Millburn's impending revenue loss, never contemplated the question whether phase-out payments would be made when a domestic insurance company relocated to another state. *See, e.g.,* William N. Eskridge, Jr., *The New Textualism,* 37 *UCLA L.Rev.* 621, 642 (1989) ("[L]egislatures usually have no determinate collective expectations about many [if any] of the concrete issues posed by their statutes.").

Even the most outspoken critics of the use of legislative history in construing a statutory text with an apparent "plain meaning" concede the appropriateness of considering which meaning is "most compatible with the surrounding body of law into which the provision must be integrated * * *." *Green v.*

*Bock Laundry Mach. Co.*, 490 *U.S.* 504, 528, 109 *S.Ct.* 1981, 1994, 104 *L.Ed.*2d 557, 576 (1989) (Scalia, J., concurring). By that standard, an interpretation of the 1983 amendment that fails to acknowledge the relationship between the repeal of the franchise tax and the authorization of "in lieu" payments to municipalities and counties that would otherwise have received the tax revenue may be incompatible with the overarching statutory context. The argument against the Appellate Division's interpretation relies more on logic and context than on the statutory language. Because the "in lieu" payments authorized by the 1981 "repeal" of the franchise tax were payable to only municipalities in which the principal office of domestic insurance companies had been located and that would have received the franchise tax but for the repeal, the phase-out payments authorized by the 1983 amendment must similarly be restricted by the condition that a domestic insurance company, which but for its repeal would be subject to the franchise tax, has relocated its office to another municipality within the state. Prupac's relocation to Indiana prior to 1981 would have ended its liability for the franchise tax, and the legislation then in effect would have afforded Holmdel no relief for its lost revenue. Accordingly, the contention is that phase-out payments to Holmdel based on Prupac's relocation to Indiana in 1987 is inconsistent with the integrated statutory purpose.

Based on its statutory antecedents, the 1983 amendment, in my view, is more coherently understood and more consistent with the related statutes if the phase-out payments were to be restricted to relocations of principal offices within the State. That preference for coherence and consistency notwithstanding, I find insufficient basis either in the legislative history or the statutory context of the 1983 amendment to override the amendment's plain meaning; and the well-established rule of statutory construction is that the plain meaning governs absent evidence of a contrary legislative intent. *Merin v. Maglaki*, 126 *N.J.* 430, 434, 599 *A.*2d 1256 (1992); *Mortimer v. Board of Review*, 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985); *Levin v. Township*

*of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). In short, although I doubt that the Legislature either considered or intended the result called for by the statutory text, I find the extrinsic grounds advanced to justify departing from that text to be inadequate. That leads me to concur in the judgment of the Court, and leaves to the Legislature the option of reexamining its own words to ascertain whether they reflect or distort the true statutory purpose of the 1983 amendment. See *City of Camden v. Byrne, supra,* 82 *N.J.* at 150, 411 *A.*2d 462.

*Concurring in result*—Justices O'HERN and STEIN—2.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.