625 A.2d 468

GE SOLID STATE, INC., A DELAWARE CORPORATION (FORMERLY THE SOLID STATE DIVISION OF RCA CORPORATION), PLAINTIFF–APPELLANT, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT–RESPONDENT.

Argued February 16, 1993—Decided June 8, 1993.

*Charles M. Costenbader* argued the cause for appellant (*Stryker, Tams & Dill,* attorneys; *Ellen S. Delo,* on the brief).

*Robert H. Stoloff,* Assistant Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Mary R. Hamill,* Deputy Attorney General, on the brief).

*Philip Kirschner* submitted a brief on behalf of *amici curiae,* New Jersey Business & Industry Association and New Jersey State Chamber of Commerce.

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal requires the Court to define the scope of *N.J.S.A.* 54:32B–8.13a ("section 8.13a"), the manufacturing exemption of the Sales and Use Tax Act ("Act"), *N.J.S.A.* 54:32B–1 to –29. That section provides an exemption from the sales and use tax for machinery, apparatus, or equipment used "directly and primarily in the production of tangible personal property by manufacturing * * *." Plaintiff, GE Solid State, Inc. ("GE"), a manufacturer of integrated circuits, claims that its purchases of photomask machinery and photoplates are exempt from the Act under section 8.13a. The Director of the Division of Taxation ("Director"), on the other hand, contends that the purchases did not meet the requirement implicit in section 8.13a and expressed in *N.J.A.C.* 18:24–4.2 ("regulation 4.2") and *N.J.A.C.* 18:24–4.4(b) ("regulation 4.4(b)") that the end product of the manufacturing process be "for sale" to a consumer. The narrow issue, therefore, is whether the manufacturing exemption applies to machinery used to produce tangible personal property that is not itself "for sale" but instead is used by the manufacturer to produce other tangible personal property, here integrated circuits, that are sold directly to consumers and on which sales taxes are paid.

## I

Most of the facts are stipulated. GE, a Delaware corporation with its principal place of business located in Somerville, New Jersey, is the successor in interest to the Solid State Division of the RCA Corporation ("RCA"). During the assessment period of July 1, 1981, through June 30, 1984, RCA engaged in the manufacture and sale of integrated circuits, commonly known as computer chips.

Integrated circuits are rectangular transistor circuits made on small flat pieces of a secure conductor material such as silicone. The integrated circuits are typically one-quarter to one-half inch on a side containing anywhere from 100 to 10 million electrical transistors. The transistors are all fabricated directly on the chip using a mass-production technique known as photolithography, and connected together with metal wiring into a single circuit. The integrated circuit may have anywhere from seven to seventeen levels or layers of elements. The production of integrated circuits has four principal phases: (1) the research and development of a prototype of the proposed integrated circuit; (2) the production of photomasks, which are templates of the prototype, for use in the mass-production of the integrated circuits; (3) the wafer-fabrication process; and (4) the packaging of the units.

In the research-and-development phase, design engineers create a schematic diagram of the seven to seventeen levels of the proposed integrated circuit. Each level has its own pattern, and the collection of patterns defines the integrated circuit. Layout designers then create artwork that is an exact replica, magnified 500 to 1,000 times, of each level of the prototype integrated circuit. A "pattern generator tape" translates the physical artwork into numerical information that is used to create prototypes, which serve as patterns for each level of the integrated circuit. The photomask set is then used to produce a number of integrated circuits for testing. If those integrated

circuits are suitable for their intended purpose, the product design is considered ready for manufacture.

Photomasks are indispensable to the manufacturing of integrated circuits. A photomask is a four- or five-inch glass plate, called a photoplate, on which one level of the design of an integrated circuit has been patterned. In the photomask operation, the second phase, the design of one level of an integrated circuit is produced on a photoplate by either an electron beam machine (MEBES machine) or an optical exposure system (TRE machine). The photoplate then goes through a number of chemical processes that result in a finished photomask that contains the pattern of one level of an integrated circuit.

The MEBES machine produces three kinds of photomasks: projection masters, print masters, and reticles. The projection master is sent directly to the silicon-wafer-fabrication phase for the actual production of the integrated circuits. The second type of photomask, the print master, is used with a contact printer machine to make another type of photomask called a contact print. The contact prints, like the projection masters, are used in the silicon-wafer-fabrication operation.

The third type of photomask produced by the MEBES machine, and the only photomask produced by the TRE machine, is a reticle. A reticle is different from other types of photomasks because the patterns on the reticle are ten times larger than actual size. The primary function of a reticle is to make other projection masters or print masters by means of a step-and-repeat machine. Reticles, like print masters, are not employed in the wafer-fabrication operation but instead remain in phase two, the photomask operation, to produce other photomasks. Only contact prints and projection masters are used in the wafer-fabrication operation.

The third phase of GE's operations is the production of the integrated circuit or wafer fabrication. The raw material of the integrated circuit is a small, round, thin wafer of silicon coated with layers of various materials such as aluminum. The wafer-

fabrication phase begins when the wafer is placed in a rinser-dryer machine. The silicon wafer is then inserted into a printer machine of which the photomask is the most critical part. In the printer, the photomask modulates ultraviolet light onto the surface of the wafer, transferring the designs or patterns of the photomasks onto the silicon wafer that will contain the final integrated circuit. The photomask does not become a component part of the integrated circuit. Because each integrated circuit has seven to seventeen levels, the entire wafer-fabrication process, using different photomasks, is repeated seven to seventeen times. The wafer is then checked for defects.

In the final phase of operations, the units are packaged. During that phase, the silicon wafers are diced into individual integrated circuits, which are affixed into a ceramic or plastic package with bunching wires from the integrated circuits to the package, and then sealed. After individual packaged units are tested and approved, they are packaged and shipped to plaintiff's customers.

## II

RCA filed timely sales-and use-tax returns with the Division of Taxation for the period from July 1, 1981, through June 30, 1984. On December 7, 1987, the Director issued a final determination to RCA assessing additional sales and use tax for that tax period. Plaintiff paid the entire deficiency. On March 3, 1988, GE, as successor-in-interest to RCA, filed a complaint in the New Jersey Tax Court, contesting $61,599 of the assessment. Of the contested sum, $40,026 is attributable to a use tax imposed on GE's purchases of machinery and equipment employed in the production of photomasks. The remaining $21,573 is attributable to a use tax imposed on GE's purchases of photoplates used as reticles and print masters in its photomask operation to make other photomasks. During the audit period, the Director conceded that projection masters and con-

tact prints used in the wafer-fabrication process are not subject to the use tax.

Before the Tax Court, GE argued that the literal language of section 8.13a and its legislative history do not require that the end product of the manufacturing process be sold. 11 *N.J.Tax* 320, 330 (1990). In the alternative, GE argued that its machinery and photoplates are exempt even if the exemption provision is limited to machinery that is directly used in the production of tangible personal property "for sale." According to GE, because its photomask machinery determines the configuration of its integrated circuits, its ultimate product for sale, that machinery must be considered to be used directly in the production of the product for sale. *Id.* at 336.

Despite the absence of any express statutory requirements, the Director, relying on the Division's own interpretative regulations, contended that the words "for sale" must be read into section 8.13a. The Director further argued that the photomask machinery and the photoplates are not used "directly" in the production of integrated circuits.

The Tax Court rejected GE's arguments. Relying on the "longstanding" regulations and the legislative history of the statute, it held that section 8.13a requires that the end product of the manufacturing process be "for sale" to consumers. 11 *N.J.Tax* at 335–36. The court also found that the photomask machinery and the photoplates were not used "directly" in the production of the integrated circuits. *Id.* at 341. Accordingly, the court concluded that neither the photomask machinery nor the photoplates was exempt under section 8.13a. *Id.* at 343.

The majority of the Appellate Division affirmed the judgment substantially for the reasons stated by the Tax Court. 254 *N.J.Super.* 653, 604 *A.*2d 189 (1992). One judge concurred in a separate opinion. *Id.* at 657–62, 604 *A.*2d 189. We granted certification. 130 *N.J.* 394, 614 *A.*2d 617 (1992).

## III

On this appeal, plaintiff alleges that the plain language and legislative history compel the conclusion that section 8.13a contains no "for sale" requirement. According to GE, the regulations misinterpret the Legislature's intent. Despite the absence of the "for sale" requirement in the statutory language, the Director asserts that "where as here the agency has promulgated a regulation whose terms have been sanctioned by the Legislature, its administrative interpretation should be sustained."

Agency regulations are presumptively valid, *Medical Soc'y of New Jersey v. Department of Law and Pub. Safety*, 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990), and should not be invalidated unless they violate the enabling act or its express or implied legislative policies. *Public Serv. Elec. & Gas Co. v. Department of Envtl. Protection*, 101 *N.J.* 95, 102, 501 *A.*2d 125 (1985). Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing. *Merin v. Maglaki*, 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992); *see Cedar Cove, Inc. v. Stanzione*, 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991). In addition, courts have consistently recognized that tax exemptions are to be strictly construed against the claimant. *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 326, 478 *A.*2d 742 (1984); *Princeton Univ. Press v. Borough of Princeton*, 35 *N.J.* 209, 214, 172 *A.*2d 420 (1961).

Nevertheless, an administrative agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits. *Kingsley v. Hawthorne Fabrics Inc.*, 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964); *see Service Armament Co. v. Hyland*, 70 *N.J.* 550, 563, 362 *A.*2d 13 (1976) (noting "an administrative interpretation [that] attempts to add to a statute something [that] is not there can furnish no sustenance to the enactment"). Accordingly, we have invalidated regulations that flout the statutory language and undermine

the intent of the Legislature. *In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992); *see Medical Soc'y, supra,* 120 *N.J.* at 25, 575 *A.*2d 1348.

## IV

Section 8.13a exempts from the Act receipts from

a. Sales of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining.

In determining a statute's meaning we consider first the statutory language, for if the statute "is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than [its] literal terms to divine the Legislature's intent." *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982); *see Maglaki, supra,* 126 *N.J.* at 434, 599 *A.*2d 1256; *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987); *International Flavors & Fragrances v. Director, Div. of Taxation,* 102 *N.J.* 210, 214, 507 *A.*2d 700 (1986). Absent a legislative intent to the contrary, such language is to be given its ordinary meaning. *Mortimer v. Board of Review,* 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985).

On its face, the language of section 8.13a includes no requirement that the "tangible personal property" be manufactured or produced "for sale." Although words chosen by the Legislature are deemed to have been chosen for a reason, *Maglaki, supra,* 126 *N.J.* at 435, 599 *A.*2d 1256 (citing *Gabin v. Skyline Cabana Club,* 54 *N.J.* 550, 555, 258 *A.*2d 6 (1969)), the dissent contends that the statute is ambiguous because it does not expressly reject the "for sale" requirement. Under the dissent's logic, every statute is deemed ambiguous unless it explicitly sets forth every possible condition, qualification, or exception that it does *not* adopt. That reasoning renders inoperable the canon of statutory construction that requires a statute to be interpreted only according to the plain meaning of

its clear and unambiguous language without resort to extrinsic aid.

Furthermore, *N.J.S.A.* 54:32B–8.13b, (section 8.13b) specifically provides an exemption for the sales of machinery, apparatus, or equipment for use "directly and primarily in the production * * * of gas [and other utilities] *for sale* * * *." (emphasis added). The express use of the words in section 8.13b indicates that the omission of the words "for sale" in section 8.13a was intentional. Under the established canons of statutory construction, where the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded. *See Marshall v. Western Union Tel. Co.,* 621 *F.*2d 1246, 1251 (3d Cir.1980). Had the Legislature intended to restrict the exemption only to machinery producing tangible personal property that is "for sale," it would have drafted the statute accordingly.

Thus, the plain and unambiguous language of the manufacturing exemption imposes no "for sale" requirement on the "tangible personal property" produced. That section's legislative history supports that conclusion. We have continually recognized that the furtherance of legislative purpose is the key to the interpretation of any statute. *Donnelley Corp. v. Director, Div. of Taxation,* 128 *N.J.* 218, 227, 607 *A.*2d 1281 (1992); *Maglaki, supra,* 126 *N.J.* at 435, 599 *A.*2d 1256. Seldom has a statute's legislative history so clearly revealed the Legislature's intent. The Sales and Use Tax Act, *L.* 1966, *c.* 30, included a manufacturing exemption, the predecessor to section 8.13a, when enacted on April 29, 1966. The exemption was amended shortly thereafter by *L.* 1966, *c.* 53, effective May 25, 1966. In 1969, the Director adopted regulations interpreting the manufacturing exemption that were virtually identical to the current regulations interpreting section 8.13a. The manufacturing exemption, however, was repealed in 1970. *See L.* 1970, *c.* 7.

In 1972, the New Jersey Tax Policy Committee issued a report to the Governor recommending the restoration of the manufacturing exemption because its absence retards investment and the growth of the state's industrial base. The Committee noted that a failure to restore the manufacturing exemption "will lead to dire consequences for the economic health of the State in terms of business and industrial location, retention of industry and expenditures on plant[s] and equipment, all of which, in turn, suggest [a] discouraging implication for jobs, income and government revenue." *Report of the New Jersey Tax Policy Committee,* "Non–Property Taxes in a Fair and Equitable Tax System," Part V at 73 (1972). The Tax Policy Committee quoted the following testimony taken at public hearings:

Most other states * * * carefully avoid such laws (sales tax on factory machinery and equipment). Some states, in fact, offer inducement in the way of tax holidays for companies willing to move from New Jersey * * *.

To survive, industrial plants located in New Jersey must compete with American industries located in many states which exempt or provide preferential treatment for investment in production facilities. Production machinery and related equipment are purchased free of State sales taxes in a majority of the nation's leading industrial states, including such states as New York, Pennsylvania, [and] Delaware. * * *

New Jersey industry's investment in new machinery is not rewarded with a credit but penalized with a tax which, necessarily, increases the sales price of manufactured goods and decreases the ability of New Jersey industries to compete successfully in the marketplace. No state wishing to encourage the growth of its industrial base and the expansion of job opportunities can afford such an obstacle to investment.

*[Ibid.]*

The Committee thus recognized the need to restore the New Jersey manufacturing exemption:

New Jersey must seek to foster a tax policy which will assure a healthy economy characterized by high employment and income levels stemming from the attraction, retention and expansion of business and industry throughout the state.

*[Ibid.]*

The Committee's prognosis was prophetic: between 1974 and mid–1975, a sharp decline occurred in the number of manufac-

turing jobs in New Jersey from approximately 850,000 to approximately 750,000. *New Jersey Economic Indicators,* No. 324, April 3, 1992, published by the New Jersey Department of Labor, Division of Labor Market and Demographic Research.

In 1977 the Legislature restored the manufacturing exemption by enacting section 8.13a, *L.* 1977, *c.* 18, using language identical to the former exemption provision. The Sponsor's Statement to the 1977 legislation noted that the bill exempted from the Sales and Use Tax the purchase of business machinery and equipment, stating that "[t]his is in keeping with the practice of neighboring states. It will help to make New Jersey manufacturers more competitive with manufacturers in surrounding states." *Senate Revenue, Finance and Appropriations Committee Statement to Assembly No. 1761* (May 13, 1976) ("Committee Statement"). Moreover, the Committee Statement declared that the exemption is intended to send "more than a token signal that the New Jersey Legislature is not anti-business" and that it expected the manufacturing exemption to have "a measurable, positive effect on the State's economy."

Nor is the "for sale" requirement consistent with the Legislature's policy in the Act against the double taxation of a single product. In *Metpath, Inc. v. Director, Division of Taxation,* 96 *N.J.* 147, 474 *A.*2d 1065 (1984), the Court acknowledged the general policy behind exemptions from the Act.

[I]t can be seen that the general legislative intent was to impose the tax on sales of tangible personal property [of the Sales and Use Tax Act] unless that property was to be resold by the purchaser. The contemplation was that the tax in such a situation would be incurred on resale. The theoretical justification for the resale exemption was "the desire to avoid pyramiding taxes as goods move along the channels of distribution toward the marketplace." Redlich, "Sales Taxes and the Resale Exemption in the Manufacture and/or Distribution of Personal Property," 9 *Tax L.Rev.* 435, 436 (1954).

[*Id.* at 151, 474 *A.*2d 1065.]

Because the Director's interpretation of section 8.13a pyramids taxes on manufactured products as they move toward the market, it contravenes that legislative policy.

## V

As in *International Flavors, supra,* 102 *N.J.* at 217, 507 *A.*2d 700, the Director urges that we ignore the clear intent of the Legislature that emerges from the statutory language and the legislative history and interpret the statute on the basis of the Division of Taxation's longstanding administrative regulations and practice.

The Director first asserts that the Legislature was aware of the 1969 regulations, which are identical to the current regulations, when it reenacted the manufacturing exemption in 1977. The Director argues that the Legislature's failure to modify the statutory language of the exemption in 1977 reveals its implicit approval of the "for sale" requirement in the 1969 regulations. However, neither the 1969 regulations nor the current regulations make an attempt to rewrite the statutory language in the manner now urged by the Director. Indeed, the regulatory statement of the statutory exemption is consistent with the language of section 8.13a. It provides:

> The purchase, rental, lease or use of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining is exempt from tax * * *.

### [*N.J.A.C.* 18:24–4.4(a).]

That provision is a mere restatement of the statutory language and does not attempt to add the words "for sale" to the statute. The regulations cited by the Director are definitions sections that do not attempt to restate the statutory exemption. Regulation 4.2 defines "machinery, apparatus or equipment"

> as any complex, mechanical, electrical or electronic device, mechanism or instrument which is adapted to the accomplishment of a production process, and which is designed to be used, and is used, in manufacturing, converting, processing, fabricating, assembling, or refining tangible personal property *for sale.* (emphasis added).

Regulation 4.4(b) defines "production":

> Production is limited to those operations commencing with the introduction of raw materials into a systematic series of manufacturing, processing, assem-

bling, or refining operations, and ceases when the product is in the form in which it *will be sold to the ultimate consumer* \* \* \*. (emphasis added).

Although those provisions make clear that the ultimate result of the manufacturing effort must be a tangible product for sale, they do not state or imply that machinery is taxable if it is used to produce other property that in turn is used to produce the product for sale. Moreover, because the literal and unambiguous language of section 8.13a is inconsistent with the regulation, the Director must demonstrate that the Legislature, in reenacting the statute, considered and approved the "for sale" limitation. In *Kingsley, supra,* 41 *N.J.* 521, 197 *A.*2d 673, the Court stated:

Where the regulation is inconsistent with the ordinary and primary meaning of the statutory language, it should be disregarded, despite the subsequent re-enactment of the statute, at least in the absence of a *clear showing* that the Legislature specifically considered the regulation and approved it in re-enacting the provision.

[*Id.* at 529, 197 *A.*2d 673 (emphasis added).]

The legislative history of section 8.13a fails to demonstrate that the Legislature even considered, much less approved, the 1969 regulation in re-enacting section 8.13a. The 1969 regulations were not of longstanding and consistent application; they were in effect only between August 1969 and the effective date of the repeal of the manufacturing exemption on March 1, 1970. Little opportunity was presented to challenge those regulations. Nor does the record disclose any direct proof that the Legislature was aware of, or actually intended to adopt, the regulations the Director had promulgated in 1969 when he reenacted the exemption in 1977.

 Second, the Director proposes that we adhere to the well-settled principle that the Legislature's failure to interfere with an administrative interpretation over an extended period of time is proof that such interpretation conforms with legislative intent. However, in view of the express language and legislative history of section 8.13a, the Legislature's longstanding acceptance of the Director's regulations is not persuasive

evidence that the regulations conform to legislative intent. That the Legislature's inaction reveals its acquiescence in the interpretive regulations is unlikely. " 'Legislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute.' " *Amerada Hess Corp. v. Director, Div. of Taxation*, 107 *N.J.* 307, 322, 526 *A.*2d 1029 (1987) (quoting 2A C. Sands, *Sutherland Statutory Construction*, § 49.10 (4th ed. 1984) (quoting *Berry v. Branner*, 245 *Or.* 307, 310, 421 *P.*2d 996, 998 (1966); *Zuber v. Allen*, 396 *U.S.* 168, 185, 90 *S.Ct.* 314, 323, 24 *L.Ed.*2d 345, 355 (1969))). True, courts have acknowledged that the practical administrative construction of a statute over a period of years without legislative interference will, under appropriate circumstances, be accorded great weight as evidence of its conformity with legislative intent. *See Body–Rite Repair Co. v. Director, Div. of Taxation*, 89 *N.J.* 540, 545–46, 446 *A.*2d 515 (1982). However, that long-continued error does not make valid what is clearly invalid is equally true. *Gladden v. Public Employment Retirement Sys.*, 171 *N.J.Super.* 363, 374, 409 *A.*2d 294 (App.Div. 1979); *see Kamienski v. Board of Mortuary Science*, 80 *N.J.Super.* 366, 370, 194 *A.*2d 743 (App.Div.1963). Moreover,

> [t]he court will consider this factor only when it is not [sic] satisfied that the Legislature's intent cannot otherwise be determined by a critical examination of the purposes, policies, and language of the enactment. When such circumstances point strongly to the imputation of a particular legislative intent, they may not be outweighed or overcome simply by a countervailing administrative practice.
>
> [*Airwork Servs. Div. v. Director, Div. of Taxation*, 97 *N.J.* 290, 296, 478 *A.*2d 729 (1984).]

Likewise, in *Fedders Financial Corporation v. Director, Division of Taxation*, 96 *N.J.* 376, 476 *A.*2d 741 (1984), we stated:

> It is well established that the Director's *regulatory authority cannot go beyond the Legislature's intent as expressed in the statute.* As Justice Clifford observed in *Service Armament Co. v. Hyland*, 70 *N.J.* 550, 563 [362 *A.*2d 13] (1976), "an administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment." (emphasis added.)

[*Id.* 96 *N.J.* at 392, 476 *A.*2d 741.]

■ With due deference to an agency's interpretation of a statute, we cannot ignore the abundantly clear purpose of that statute. *International Flavors, supra,* 102 *N.J.* at 218, 507 *A.*2d 700. Because the legislative intent in section 8.13a is so clear, the Director's reliance on the Division of Taxation's administrative regulations is misplaced. Nor does evidence of the agency's administrative practice offer much support for the Director. At the trial William J. Bryan, III, currently liaison for the Division of Taxation to the Attorney General's Office, testified as an expert for the State to establish the Division's audit policy. He agreed that no published position, other than regulations, specifically states that machinery used to make a part or a feature of production machinery is not allowable as an exemption for production equipment.

Moreover, no evidence reveals whether any taxpayers other than plaintiff challenged the present regulations promulgated in September 1977. Nor do we know whether any taxpayer besides plaintiff has challenged the Director's administrative practice regarding the "for sale" requirement of section 8.13a. We do know, however, that in the year 1981 and subsequent years, plaintiff did challenge both the administrative practice, when it arose on audit, and the Director's regulations. Finally, our interpretation of the statute accords not only with the legislative purpose in enacting section 8.13a but also with the Legislature's continued recognition of the importance of attracting and retaining high-technology industry in New Jersey. In enacting the Jobs, Science and Technology Bond Act of 1984, *L.* 1984, *c.* 99, para. 2, the Legislature asserted:

> The future economic well-being of New Jersey requires that increased efforts be made to retain existing industry and attract new high technology industry to the State. It is also imperative that steps be taken to ensure that the State's work force is adequately trained in the new technologies.

The Legislature also established the New Jersey Commission on Science and Technology to make New Jersey a center of scientific innovation, and thus a magnet for high-technology

industry. *See N.J.S.A.* 52:9X–1 to –10. In view of the alarming decline in manufacturing jobs in New Jersey and the fierce competitive battles among the states and foreign nations to lure the industries of the future, the concerns expressed by the 1972 Tax Policy Committee and the Legislature are even more pressing today. A fundamental element in the development and expansion of high-technology industries is a "competitive tax structure." Theodore A. Minde, *New Jersey High Technology Economy, A Profile of Recent Developments and Comparative Performance,* N.J. Department of Commerce and Economic Development, February 1983. Because New Jersey's tax policy is an important consideration for an industry's location and investment decisions,

> it is important that the state not impose relative cost disadvantages vis a vis other states for New Jersey's manufacturing (and other) businesses. The contribution of economic growth—to income, employment, and tax revenue—is central to the state's well being. Without a growing output and employment base, all the legitimate and noble goals of the public sector will be difficult, if not impossible, to achieve.
>
> [James W. Hughes & Joseph J. Seneca, *The New Jersey Manufacturing Employment Hemorrhage,* Rutgers Regional Report, June 1992, at 19.]

Although the interpretation of a tax statute by the agency charged with its administration is entitled to weight in a judicial proceeding, the grounds advanced by the Director to justify departing from the statutory text are inadequate. *See Township of Holmdel v. Director, Div. of Taxation,* 130 *N.J.* 522, 529, 617 *A.*2d 656 (1992) (Stein, J., concurring). The Legislature's clear intent to encourage economic growth by providing a competitive tax policy and the absence of any statutory language implying otherwise lead to the conclusion that section 8.13a has no "for sale" requirement. Because the photomask machinery and the photoplates satisfy all the express and unambiguous requirements of section 8.13a, they are exempt from the tax. Accordingly, we do not reach plaintiff's alternative argument that its photomask equipment is so essential and substantial a step in the manufacturing process that its machinery must be considered as being used "directly" in the production of the product for sale.

The judgment of the Appellate Division is reversed and the cause is remanded to the Tax Court for entry there of judgment in favor of plaintiff.

HANDLER, J., dissenting.

The Court flatly rejects the longstanding interpretation and application by the Legislature and the Division of Taxation of *N.J.S.A.* 54:32B–8.13a ("section 8.13a"), the "manufacturing" exemption of the Sales and Use Tax Act, *N.J.S.A.* 54:32B–1 to – 29. The Court now holds that the "manufacturing" exemption can apply to items of property that are used in the course of the manufacturing process even though their function in that process does not itself result in the finished product. I disagree with that determination.

In my opinion, the "for sale" requirement as reflected in the implementing administrative regulations appropriately serves to define what items of manufacture are used "primarily and directly" in the manufacturing process and are eligible for the statutory exemption, and that understanding of the scope and application of the exemption comports with the intention of the Legislature. The reasons for that conclusion are fully expressed in the Tax Court opinion of Judge Andrew, 11 *N.J.Tax* 320 (1990), and by the opinion of the Appellate Division, 254 *N.J.Super.* 653, 604 *A.*2d 189 (1992), affirming the Tax Court judgment.

This is a classic case of statutory construction. The Court first applies the canon relating to statutory plain language. That canon requires a statute to be interpreted only according to the plain meaning of its clear and unambiguous language without resort to any extrinsic aid. *E.g., State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). In applying that canon the Court accepts plaintiff's argument and its conclusion that "the plain and unambiguous language of the manufacturing exemption imposes no 'for sale' requirement on the 'tangible personal property' produced." *Majority* at 308, 625 *A.*2d at 473.

The fact of the matter is the language of the exemption section is not "plain and unambiguous." Section 8.13a exempts from the Act receipts from

[s]ales of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining.

It is just not possible to ascertain from the *face* of that provision alone whether a "for sale" condition or any other similar qualifying condition relating to marketability was intentionally omitted by the Legislature. Not only is the language unclear on whether the omission of a qualifying term, such as "for sale," was intentional or not, but the terms actually included in the section—"used primarily and directly in the production, etc."—are hardly self-defining and do not have a "plain meaning." Indeed, those terms strongly suggest that it would be important to identify where on the continuum of the manufacturing process the item of property is actually used in order to ascertain whether that use can reasonably be characterized as "primary and direct" in relation to the finished product. The term thus implies that some kind of a condition concerning whether the manufactured product is a finished or completed item may be important and helpful in determining whether other tangible personal property—*i.e.,* "machinery, apparatus, or equipment" that is used to produce that end-product—is eligible for the exemption. What thus seems clear is that the language of the exemption is unclear. Hence, the meaning of the statutory exemption cannot be resolved by claiming that its language is plain and unambiguous.

The ambiguity of the language of the section is evidenced by the Court's own analysis. While professing to derive its interpretation from the literal terms of its language, the Court actually looks beyond the face of the statute to external sources. It refers to another exemption of the statute, *N.J.S.A.* 54:32B–8.13b, to shed light on the meaning of section 8.13a.

Statutory provisions in *pari materia* should be read together and reconciled if possible in order to determine the underlying

legislative intent. *E.g., Nero v. Hyland,* 76 *N.J.* 213, 221, 386 *A.*2d 846 (1978). Section 8.13b specifically provides an exemption for the sale of machinery, apparatus or equipment for use "directly and primarily in the production ... of gas [and other utilities] *for sale*" (emphasis added). "The express use of the words in section 8.13b," according to the Court, "indicates that the omission of the words 'for sale' in section 8.13a was intentional. Had the Legislature intended to restrict the exemption only to machinery producing tangible personal property that is 'for sale,' it would have drafted the statute accordingly." *Majority* at 308, 625 *A.*2d at 473. The short rebuttal of that position is furnished by Judge Andrew:

> Plaintiff argues that the express use of the words "for sale" in subpart b. of the exemption provision at § 8.13 demonstrates that the Legislature intentionally omitted the words "for sale" in subpart a. of § 8.13. The argument is not convincing. In § 8.13 the Legislature expressed a desire to exempt machinery used in the production of electricity, etc., "for sale" or in the operation of sewerage systems. The use of the words "for sale" was required to permit an expansion of the machinery exemption to the production of electricity, etc. other than "for sale." In § 8.13a. the expression, "for sale," was unnecessary.

[11 *N.J.Tax* at 336 n. 5.]

Thus, apart from the Court's implicit acknowledgment that the language of section 8.13a is not plain and unambiguous, the conclusion it reaches based on its comparison between sections 8.13a and 8.13b is flawed.

The Court also invokes the extrinsic aid of legislative history. It recounts accurately and completely the historical chronology of the current exemption. Nevertheless, it is off the mark in concluding that the history forecloses an interpretation that manufacturing machines are exempt even though their function in the manufacturing process does not result in the finished product.

An exemption for property used in manufacturing production was originally enacted in 1969. The Director of the Division of Taxation adopted regulations interpreting that first exemption. The original exemption was then repealed and the current exemption was enacted in 1977. In the interim the statutory

exemption and the tax policy considerations surrounding such an exemption were the subject of a study of the Tax Policy Committee. The specific recommendation of the Committee was to restore the production-machinery exemption.

The current exemption was reenacted by the Legislature in 1977 based on the Committee's recommendation. The exemption was phrased in language identical to the original statutory exemption. Further, shortly after its passage, the Director, in September 1977, promulgated the current regulations, which interpret the manufacturing exemption in language almost identical to the Director's regulations interpreting the original exemption. "Both sets of regulations," as pointed out by Judge Andrew, "interpret the machinery exemption as being applicable only when the finished product is tangible personal property 'for sale' to the 'ultimate consumer.'" 11 *N.J.Tax* at 332–33. Thus, not only is the current statute identical to the previous enactment, but the current regulations are virtually identical to the regulations adopted by the Director after the machinery exemption provision at section 8.13a was reenacted by the Legislature.

I am mystified that the Court can state that the Legislature was not aware of the Director's official interpretation of the exemption statute when it reenacted that exemption in 1977. The Legislature specifically acted on the Committee's recommendation—a recommendation itself predicated on a long study of the earlier exemption, which obviously and necessarily included the Director's implementing regulations defining that exemption.

In discounting the fact that the legislative action was based on that understanding, the Court adopts the position taken by the concurring judge in the Appellate Division: "[T]he record here contains no direct proof that the Legislature was aware of, or actually intended to adopt, the regulations promulgated by the Director under the statute before its repeal." 254 *N.J.Super.* at 659, 604 *A.*2d 189. The Court echoes that position, *viz:* it finds no "direct proof that the Legislature was aware of, or

actually intended to adopt, the regulations promulgated by the Director in 1969 when it reenacted the exemption in 1977." *Majority* at 312, 625 *A.*2d at 475.

I am perplexed that the Court imposes a burden of proof in this context—and not just a burden of proof, but one that requires "direct proof." The inquiry after all entails the search for *legislative* intent, not a search for *legislators' actual* intent. *Cf. Riggs v. Long Beach Township*, 109 *N.J.* 601, 613, 538 *A.*2d 808 (1988) (allowing proof of improper ulterior motives of municipal officials in passage of local zoning ordinance to vindicate claim of property owner that ordinance was invalid). Legislative intent is extrapolated from relevant circumstances surrounding the passage of legislation, and that determination is rarely governed or settled by formal rules imposing a burden of proof. The judicial determination of legislative intent encompasses extrinsic evidence relating to the meaning of legislation, including legislative history, and ultimately is informed by our conventional and ordinary understanding of government operations and the normal presumptions that are invoked to make sense out of the past, particularly when every legislative event is not and cannot be and need not be chronicled. The approach to that kind of determination is exemplified by Judge Andrew's explanation and use of the relevant legislative history:

> [T]he tax policy committee specifically recommended a restoration of the machinery exemption and that exemption provision had been interpreted by the Director through the regulations issued in August 1969. The committee had to have been acutely aware of the Director's interpretive regulations at the time that it made its specific recommendation, yet, it did not suggest any changes in statutory language.
>
> When the Legislature, in fact, reenacted the exemption provision it employed the identical language of the former exemption provision. Thus, it must be presumed that it agreed with, and adopted, the interpretation of that language by the very agency charged with its administration. [Citation omitted.]

[11 *N.J.Tax* at 333–34.]

His conclusion, I submit, is right on target.

Thus, the Legislature reenacted a statutory provision that had in fact been given a practical interpretation by the adminis-

trative agency most familiar with the enactment and charged with its implementation, and whose interpretation was obvious to those who studied the underlying tax policy and examined the statute to resolve that policy. In addition, when the statutory exemption was reenacted, that administrative agency, the Division of Taxation, which was charged with its implementation and application, immediately adopted regulations that interpreted the exemption, thus strongly confirming the underlying legislative understanding of the scope of the exemption. The canon of construction based on those circumstances is expressed in *Ford Motor Co. v. New Jersey Department of Labor & Industry,* 7 *N.J.Super.* 30, 38, 71 *A.*2d 727 (App.Div.1950), quoted by Judge Andrew: "Where a statute has received a ... practical interpretation, and the statute as interpreted is reenacted, the practical interpretation is accorded greater weight than it ordinarily receives, and is regarded as presumptively the correct interpretation of the law." 11 *N.J. Tax* at 334.

More important, the statutory exemption as interpreted and applied by the Director has endured for a long time. That circumstance should invoke the well-settled canon that a practical and uniform administrative construction of a statute with which the Legislature has not interfered over an extended period of time is strong evidence that the administrative interpretation conforms with legislative intent, and thus is accorded great weight. *Body–Rite Repair Co. v. Director, Div. of Taxation,* 89 *N.J.* 540, 545–46, 446 *A.*2d 515 (1982). The majority, however, also misapplies that canon. It initially says: "[T]he Legislature's long-standing acceptance of the Director's regulations is not persuasive evidence that the regulations conform to legislative intent." *Majority* at 312–13, 625 *A.*2d at 475. Why is it not "persuasive evidence"? Because, by some alchemy, the Court turns "long-standing acceptance" into "inaction," and because "inaction" is a "weak reed" on which to base the interpretation of a statute, the long period over which the Director has interpreted and applied the statute cannot, accord-

ing to the Court, support a legislative acceptance of the administrative agency's regulations. *Ibid.*

Even the concurring judge below, who was not impressed by the interpretive significance of the legislative reenactment in 1977 of the identical original exemption as defined by the Director, was convinced that its subsequent history evidenced not "inaction," but rather "long acceptance" by the Legislature of the administrative understanding of the exemption. That administrative interpretation, therefore, should be viewed as consistent with and expressive of the underlying legislative intent. He pointed out:

> [W]e review this case almost *fifteen* fiscal years after the relevant regulations were adopted and during which the Legislature relied upon projections from Sales and Use Tax receipts and on Sales and Use Tax Revenues, as reported by the Department of the Treasury, in considering the adopting State budgets. *See N.J.S.A.* 52:27B–20 *et seq.,* –46. *See also N.J.S.A.* 52:18A–4, –6, –6.2, –32, –46. Those projections and receipts were premised on the regulations of the Director of the Division of Taxation in the Department of the Treasury. *See N.J.S.A.* 52:18A–3, –24, –25, –48.

[254 *N.J.Super.* at 660, 604 *A.*2d 189.]

The Court observes that "that long-continued error does not make valid what is clearly invalid." *Majority* at 313, 625 *A.*2d at 475–76. An administrative construction may, indeed, be rejected if it is "just plain wrong." *International Flavors & Fragrance, Inc. v. Director, Div. of Tax.,* 102 *N.J.* 210, 221, 507 *A.*2d 700 (1986) (Clifford, J., concurring). However, unless one can show convincingly that the Director's interpretation is "error," let alone "long-continued error"—that it is "just plain wrong"—the legislative acquiescence in that interpretation cannot be explained away by characterizing it as simply "inaction."

The focus should not be on whether the agency interpretation is indisputably correct, but on whether it is not plainly unreasonable. The sound approach is not to reject agency interpretation because it has not been proved to be correct, but to recognize that "the agency's interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable."

*Metromedia v. Director, Div. of Taxation,* 97 *N.J.* 313, 326, 478
*A.*2d 742 (1984). The Legislature presumptively adopted the
Director's interpretation when it reenacted the machinery ex-
emption, and thereafter for many years actually used and
applied the exemption in accordance with that understanding.
*See In re Boyan,* 127 *N.J.* 266, 268, 604 *A.*2d 98 (1992) (adopt-
ing specific provisions in appropriations acts can influence
meaning of related statute). That legislative conduct should be
regarded as its "acceptance" and confirmation of the Director's
interpretation, and ought not be rejected or discounted unless
that interpretation is otherwise "plainly unreasonable."

The Court never demonstrates that the Director's interpreta-
tion is "plainly unreasonable." Its ultimate basis for character-
izing the Director's interpretation as "error" is the Court's own
view that the exemption should be broader than it is. The
Court argues that because the Legislature wanted to enhance
the competitive position of New Jersey manufacturers, *vis-a-vis*
those in neighboring states, it necessarily opted to enact a
broad exemption, one that would cover more property items
used in the manufacturing process than only those used to
complete the finished product as contemplated by the original
exemption according to the Director.

The Court, while purporting to explain the tax policy that was
in fact recommended by the Committee and adopted by the
Legislature, actually is expressing its own views, and thus, in
effect, is exercising a legislative or administrative discretion
relating to State tax policy. The judgment concerning the
breadth of the machinery exemption is one involving tax policy,
which should be left to other branches of government.

The legislative and administrative history indicates that the
central tax policy issue was whether a so-called machinery
exemption should be provided. That policy issue was resolved
by the judgment to have such an exemption. The history does
not demonstrate a discrete determination that the exemption
should be restored only in its broadest possible form. Although

the broad-form exemption, as now urged by the Court, might, indeed, make New Jersey manufacturers more competitive, it will also reduce revenues. Nothing in the circumstances surrounding the reenactment of the exemption suggests that the other branches of government were not satisfied that the exemption as applied by the Division of Taxation makes our manufacturers sufficiently competitive. Nor does anything suggest that the other branches were willing to reduce public revenues by broadening the exemption in order to make manufacturers even more competitive. In short, the record contains no showing that the legislative or executive branches, in adopting and implementing the current machinery exemption, did not, consistent with the administrative understanding, appropriately resolve and balance the conflicting tensions between maintaining the public coffers and enhancing local competition.

Those concerns, I repeat, implicate tax policy and are remitted exclusively to the nonjudicial branches of government. The expansion of a tax exemption is surely not the business of the courts. The point is illustrated by the Director's reference to the 1988 Final Report of the State and Local Expenditure and Revenue Policy Commission (SLERP). In that report the Commission recommended that the existing statutory language in section 8.13 be "clarified" by *expanding* the exemption to include the sales of supplies" and *"extending* the exemption to machinery which is used to produce production equipment, parts of other features of the production machinery itself." See Final Report, SLERP (1988), at 118 (emphasis added). The Director reasonably asserts that the recommendation in the SLERP report recognizes the common understanding that the manufacturing exemption does not apply to machinery used to produce something other than a final product for sale. *Id.* at 334–35. As expressed by the Appellate Division in dealing with the taxpayer's arguments, which are similar to the Court's position, any shift from that understanding implicates matters of tax policy.

Even though GE's arguments are impressive, we find no basis for interfering with the longstanding interpretation of the claimed exemption. To hold otherwise, would cause a substantial interruption of existing State tax policies. Such an interruption should come only from the Legislature.

[254 *N.J.Super.* at 657, 604 *A.*2d 189.]

Thus, in light of the legislative history of the manufacturing exemption, the Director's interpretive regulations, the Director's longstanding practice and consistent implementation of the exemption, the concomitant acceptance by the Legislature of that agency interpretation, the consistent and actual legislative application of the agency's interpretation of the exemption as a revenue-raising measure, and the common understanding of the exemption provision, I find the Director's construction manifestly reasonable—it is surely "not plainly unreasonable"—and accordingly, it must prevail. *See Metromedia, supra,* 97 *N.J.* at 327, 478 *A.*2d 742. As expressed by the Appellate Division,

[a]n agency's interpretation of a statute it is entrusted with enforcing should prevail unless plainly unreasonable, ... or unless that construction is "just plain wrong." ... Agency regulations are presumptively valid, ... and should not be invalidated unless they violate the enabling Act or its express or implied legislative policies.... Since the Legislature took no action to overturn the agency's regulations that have existed since 1969, the presumption of validity is enhanced. Beyond that, tax exemptions are to be strictly construed. [ (Citations omitted.) ]

[254 *N.J.Super.* at 657, 604 *A.*2d 189.]

In sum, the manufacturing exemption applies only to a property item that itself is used to produce a finished or final product—one ready for sale to the consumer in accordance with the Director's regulations. That understanding of the scope and application of the manufacturing exemption is a reasonable definition and a practical clarification of the broad statutory terms of "used primarily and directly" in production.

I would affirm the judgment below.

CLIFFORD and POLLOCK, JJ., join in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices O'HERN, GARIBALDI and STEIN—4.

*For affirmance*—Justices CLIFFORD, HANDLER and POLLOCK—3.