903 A.2d 442

QUEST DIAGNOSTICS, INC., PLAINTIFF–APPELLANT,
v. DIRECTOR, DIVISION OF TAXATION,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted March 29, 2006—Decided August 2, 2006.

Before Judges WECKER, FUENTES and GRAVES.

*Sukel & Associates,* attorneys for appellant (*Steven P. Sukel,* on the brief).

*Zulima V. Farber,* Attorney General, attorney for respondent (*Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Marlene G. Brown,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

Plaintiff, Quest Diagnostics, Inc., a medical testing laboratory, appeals from a final judgment of the Tax Court denying its claimed exemption from sales and use tax on vacutainers used in the collection of specimens. We now affirm.

These are the pertinent facts regarding Quest's use of the vacutainers, derived from the agreed or undisputed facts available to the Tax Court on the Division's motion for summary judgment. Quest, which describes itself as the largest diagnostic testing laboratory in the country, performs laboratory testing of human blood, urine, and other bodily specimens when prescribed by physicians. The majority of the collected specimens are blood, and the most common testing is for such information as glucose and cholesterol levels and blood counts. These are examples only, and not a complete description of the tests Quest performs.

The vacutainers are test tubes that are sealed by the manufacturer with a vacuum inside. In order to draw blood, a trained medical professional inserts a needle into a patient's vein and then punctures the top of the vacutainer's rubber top with the opposite end of the needle. The puncture breaks the vacuum seal, and the

outside air pressure causes suction, which draws blood from the vein through the needle and into the vacutainer.

Each vacutainer contains a chemical essential to the preservation or preparation of the sample for testing. The vacutainers are of two varieties and are distinguished by different colored tops. The lavender-topped vacutainers contain EDTA, an anti-coagulant that preserves the blood specimen in its original, whole form until it can be transported to the laboratory and tested. The black-topped vacutainers contain a clot activator for the separation of blood elements for testing. The vacutainers are never reused; they are treated as bio-hazardous waste and destroyed after the specimens are tested.

As is common in the industry, Quest provides vacutainers without charge to physicians who collect the samples and prescribe such testing. Quest supplies a "courier" box from which it collects such samples as requested. Quest also maintains centers for those patients whose physicians do not collect the samples in their offices. In either case, the cost of the vacutainer is passed through to the patient or third-party insurance payor as part of the test fee. Quest also tests specimens that have been collected in vacutainers supplied to physicians by a competitor laboratory, and Quest's competitors also test specimens that have been collected in Quest's vacutainers.

In the matter before us, Quest paid sales tax on its purchase of vacutainers from Becton–Dickinson during the period from April 1, 1996 through December 31, 2000. In the course of an internal audit, Quest's auditor advised the company that certain of the supplies upon which it had paid sales tax, including the vacutainers, should have been exempt from taxation. As a result, Quest filed a request with the Division for refund of $2,107,197. When the Division undertook its own audit, it determined that Quest owed an additional $984,325.56 in sales and use tax due on other items for the same period. An agreement was reached to offset the additional tax due, against the claimed refund, leaving Quest's refund request to be addressed to the extent of the balance that

arose out of tax paid on vacutainers. Thus the only issue before us is the taxability of Quest's purchase or use of vacutainers.

We are concerned with two sections of the Sales and Use Tax Act, specifically, *N.J.S.A.* 54:32B–3, which imposes the tax, and *N.J.S.A.* 54:32B–8.15, which provides the exemption claimed by Quest. Prior to its recent amendment increasing the tax to 7%,[1] *N.J.S.A.* 54:32B–3(a) provided, in relevant part, "There is imposed and there shall be paid a tax of 6% upon [t]he receipts from every retail sale of tangible personal property, except as otherwise provided in this act."[2] *N.J.S.A.* 54:32B–6 provides for a compensating "use tax" upon the purchase price of tangible personal property subject to the sales tax, when no such tax was collected by the seller.[3]

The exemption which Quest invokes to qualify its purchase and use of vacutainers is defined by *N.J.S.A.* 54:32B–8.15, which provides, in pertinent part, *"Sales or use* of wrapping paper, wrapping twine, bags, cartons, tape, rope, labels, *nonreturnable containers,* reusable milk containers, and *all other wrapping supplies when such use is incidental to the delivery of any personal property* . . . are exempt from the tax imposed under the Sales and Use Tax Act." (Emphasis added). Quest maintains that the vacutainers qualify either as "nonreturnable containers," on the ground that they cannot be reused, or as "other wrapping

---

[1] *See* Assembly, No. 4901 (amending and supplementing *L.* 1966, *c.* 30, effective July 15, 2006).

[2] *N.J.S.A.* 54:32B–3(b) provides a similar tax on receipts for certain services. Laboratory testing, such as performed by Quest, is not subject to the tax on services.

[3] *N.J.S.A.* 54:32B–6 provides, in pertinent part:

Unless property or services have already been or will be subject to the sales tax under this act, there is hereby imposed on and there shall be paid by every person a use tax for the use within this State of 6%, except as otherwise exempted under this act, (A) of any tangible personal property purchased at retail . . . .

supplies," on the ground that they envelope the blood and secure it for transport.

The Division relies upon Quest's distribution of vacutainers without charge to physicians, who "could return the vacutainers unused or could use them to transmit blood or other specimens to Quest for testing, but were not required to do so," and maintains that "Quest thus 'used' this tangible personal property as an inducement to employ its testing services, [rendering] the vacutainers ... taxable ...." The Division cites the principle that "tax exemptions are narrowly construed, reflecting the legislative intent of the 'inclusive' taxability of the Act." The Division notes that "because Quest performed non-taxable services for its customers," an exemption would "result in an incorrect loss of tax revenue ...." In sum, the Division relies upon "Quest's business, the plain language of the Act, relevant case law and even common sense" to conclude that the vacutainers were "a taxable cost of business."

■ The scope of review of the Division's decision, both in the Tax Court and before us, is limited. As the Supreme Court has said:

> We have recognized that the Director's expertise, particularly when exercised in the specialized and complex area covered by these provisions of the Act, is entitled to great respect by the courts. Moreover, the agency's interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable. [*Metromedia, Inc. v. Dir., Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A.2d* 742 (1984) (internal citations omitted).]

*See also GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 *N.J.* 298, 306, 625 *A.*2d 468 (1993) ("Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing."); *Aetna Burglar & Fire Alarm Co. v. Dir., Div. of Taxation*, 16 *N.J.Tax* 584, 589 (1997) ("[T]he Director's construction of the operative law, which is not plainly unreasonable and with which the Legislature has not interfered, is entitled to prevail.").

■ The Court has repeatedly noted that "tax exemptions are to be strictly construed against the claimant." *GE Solid State,*

*supra,* 132 *N.J.* at 306, 625 *A.*2d 468 (citing *Metromedia, supra,* 97 *N.J.* at 326, 478 *A.*2d 742); *see also Metpath, Inc. v. Dir., Div. of Taxation,* 96 *N.J.* 147, 152, 474 *A.*2d 1065 (1984) ("[W]e are mindful of the general principle that tax exemptions are to be construed narrowly."). Moreover, it is the taxpayer claiming an exemption who bears the burden of proving its applicability. *Id.* at 153, 474 *A.*2d 1065. "[A]ll doubts which arise are to be resolved against the party seeking the exemption." *Millington Quarry, Inc. v. Taxation Div. Dir.,* 5 *N.J.Tax* 144, 147 (1983); *see also Adamar of N.J. v. Dir., Div. of Taxation,* 17 *N.J.Tax* 80, 85 (1997) (when the taxpayer seeks an exemption, "the probable legislative intent is one of inclusion and exemptions are to be construed narrowly"), *aff'd,* 18 *N.J. Tax* 70 (App.Div.1999); *Global Terminal & Container Servs., Inc. v. N.J. Div. of Taxation,* 9 *N.J.Tax* 152, 158 (1987) ("[E]xemption statutes must be strictly construed, and the burden is on the taxpayer to establish entitlement to exemption.").

The Tax Court went through a somewhat more complex analysis of the words of the exemption statute than necessary to conclude that the vacutainers were neither "nonreturnable containers" nor "other wrapping supplies." We need not adopt the court's analysis in full to conclude that the result was correct and the decision must be affirmed. Irrespective of their name, these test tubes constitute medical equipment essential to the process of drawing blood, as Quest itself has carefully explained. They contain a chemical additive essential to the proper preservation and preparation of the blood samples. Yes, they also serve the function of a "container" in which the samples are transported to the laboratory, but they are "returnable" containers, although they are not reusable once punctured or filled with blood. Clearly, however, they are an essential part of the operation and function of Quest's laboratory business, and common sense dictates that they are neither "containers" nor "wrapping materials" as contemplated by the exemption statute.

██ It has been said, in connection with statutory interpretation, that a literal reading of the words of the statute may not yield the Legislature's intended result. *See Smith v. Fireworks by Girone, Inc.,* 180 *N.J.* 199, 216, 850 *A.*2d 456 (2004) ("[I]t is well settled that statutory construction should not turn on literalisms, but on the objectives of the legislation and the common sense of the situation."). Writing for the Court in *Fireworks by Girone,* Justice Long quoted Chief Justice Weintraub's words on statutory interpretation:

> It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end words used may be expanded or limited *according to the manifest reason and obvious purpose of the law.* The spirit of the legislative direction prevails over the literal sense of the terms.
>
> [*Ibid.* (quoting *New Capitol Bar & Grill Corp. v. Div. of Employment Sec.,* 25 *N.J.* 155, 160, 135 *A.*2d 465 (1957)) (internal quotation marks omitted).]

Moreover, the various arguments of the parties, as well as the trial court's analysis, in attempts to interpret the literal words of the statute, demonstrate the inherent ambiguities in the exemption statute as applied to these facts. To the extent that the statute is ambiguous, we adhere to the principle of narrow construction. *See, e.g., GE Solid State, supra,* 132 *N.J.* at 306, 625 *A.*2d 468.

Affirmed.