DeALMEIDA, P.J.T.C.
Plaintiffs Joseph J. Murphy and Diane Fitzmyer-Murphy, a married couple, challenge a final determination of the Director, Division of Taxation denying their request for a refund of $157,535 in gross income tax for tax year 2005. The refund request was based on $10 million in payments the couple made to the federal government and a bankruptcy Trustee in 2008 to settle civil claims filed against them in the wake of criminal activity by Mr. Murphy’s employer. Plaintiffs argue they should be permitted to amend their 2005 income tax return to reflect a reduction in their taxable income for that year because a portion of the 2008 payments was, in effect, a forfeiture of a portion of Mr. Murphy’s 2005 income. For the reasons stated more fully below, the court concludes that the Director’s denial of plaintiffs’ refund request comports with the plain text and structure of the Gross Income Tax Act (the “GIT Act”) and will be affirmed.
I. Findings of Fact
This opinion sets forth the court’s findings of fact and conclusions of law on the parties’ cross-motions for summary judgment. R. 1:7-4. The court’s findings of fact are based on the certifications and exhibits submitted by the parties on the motions.
Plaintiffs resided in New Jersey during the years at issue in this matter. On March 15,1999, Mr. Murphy joined Refco, Inc. as the President of one of its subsidiaries. Refco, Inc. and its related entities constituted a commodities and futures trading brokerage firm that provided execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets.
On August 5, 2004, Thomas H. Lee Partners, LP (“THLP”) and Refco, Inc. engaged in a leveraged buyout (“LBO”) in which THLP paid $507,000,000 in cash for a 57% equity interest in Refco and its subsidiaries. This transaction resulted in capital gains to Mr. Murphy of $9,466,000 in 2004 and $4,142,000 in September 2005 (the “Profit Share Payment”).
In August 2005, Refco, Inc. and its subsidiaries were involved in an initial public offering (“IPO”) in which the companies sold *437 12,500,000 shares and existing shareholders sold 14,000,000 shares at a price of $22 per share. An additional 3,975,000 shares were sold by Refco, Inc. and its subsidiaries pursuant to the exercise of the IPO’s underwriters’ over-allotment purchase option. The proceeds from the over-allotment sale were used to pay an aggregate dividend of approximately $82,000,000 to the pre-IPO shareholders. This transaction resulted in a total payment to Mr. Murphy of $381,558 on August 18, 2005 (the “Green Shoe Dividend”).
On October 10, 2005, approximately two months after consummation of the IPO, Refco, Inc. issued a press release disclosing the existence of a previously undisclosed $430,000,000 receivable from a related company. This receivable had previously been fraudulently recorded as a receivable from an unrelated third party. The falsely reported receivable was part of a fraudulent “Round Trip Loan” scheme designed to present an inaccurate financial picture at various points in Refco Inc.’s history, including at the times of the LBO and IPO. The purpose of the scheme was to defraud creditors and investors in Refco, Inc. Bankruptcy proceedings for Refco, Inc. and its subsidiaries were filed almost immediately after the October 10, 2005 disclosure.
In the aftermath of the bankruptcy filing, three Refco, Inc. officers were indicted for orchestrating and participating in a massive fraudulent scheme to manipulate the financial statements of various Refco-related companies that were publicly reported and supplied to lending institutions and regulators. Those officers either plead guilty or were convicted of criminal charges. Mr. Murphy was not charged with any crimes; nor was he subjected to disciplinary sanctions by any regulatory agency as a result of the Refco fraud. Nothing in the record suggests that Mr. Murphy was aware of the illegal acts of the three corrupt Refco, Inc. officers or had any culpability with respect to their fraudulent scheme.
Plaintiffs filed a timely New Jersey gross income tax return for tax year 2005 which included in their income the $4,142,000 received by Mr. Murphy from the LBO during 2005 and the *438 $381,558 received by Mr. Murphy from the Green Shoe Dividend during 2005. The income from the LBO was reported as net gains or income from the disposition of property pursuant to N.J.S.A. 54A:5-lc and the income from the Green Shoe Dividend was reported as income from dividends pursuant to N.J.S.A. 54A:5-lf. Plaintiffs paid the tax due on this income.
On October 17, 2007, the Trastee appointed by United States Bankruptcy Court for the Southern District of New York with respect to the Refeo, Inc. matter filed an action against Mr. Murphy seeking to set aside alleged fraudulent and preferential transfers to him from Refeo, Inc., including the amounts received by Mr. Murphy from the LBO and Green Shoe Dividend during 2005, as well as other amounts received by Mr. Murphy in prior years.
On December 24, 2008, Mr. Murphy agreed to settle the Trustee’s claims by paying to the Trustee $5 million “in full satisfaction and compromise of the Trustee’s claim to the Profits Share Payment and Green Shoe Dividend.” Mr. Murphy acknowledged that the Trustee would make the $5 million available to the creditors of Refeo, Inc. On December 30, 2008, Mr. Murphy caused $5,000,000 to be wired to the Trustee in accord with the settlement.
On November 16, 2007, the United States Attorney for the Southern District of New York filed an action seeking the forfeiture of a brokerage account held by plaintiffs, alleging that the funds in the account were the proceeds of the criminal activities of Refeo, Inc.’s three convicted officers. The filing of the action had the effect of freezing the account.
On December 29, 2008, plaintiffs entered into a Consent Order of Forfeiture with the United States of America agreeing “to forfeit $5 million to the Government in full satisfaction of the Government’s asserted forfeiture claims arising from the August 5, 2004 LBO.” Plaintiffs acknowledged that the United States would make the $5 million available to the “innocent victims of the Refeo fraud to compensate their losses." On December 30, 2008, *439 plaintiffs caused $5,000,000 to be transferred to the United States Marshal’s Service to satisfy the Consent Order of Forfeiture.
Plaintiffs allege that although they were the innocent holders of the funds Mr. Murphy received from Refeo, Inc. in 2005, they settled the claims of the Trustee and the United States to avoid legal fees and publicity that would negatively affect Mr. Murphy’s career as a corporate executive were they to bring the claims to trial.
On June 12, 2009, plaintiffs filed with the Director a timely claim for refund relating to their tax year 2005 gross income tax liability. The refund request was set forth in an amended 2005 gross income tax return. As noted above, the thrust of plaintiffs’ refund claim was that a portion of the $10 million they paid to the federal government and Trustee was, in effect, a forfeiture of a portion of the income earned by Mr. Murphy from the LBO and Green Shoe Dividend in 2005. They contend that they are entitled to amend their 2005 return to reduce their taxable income by the portion of the $10 million payment they attribute to the proceeds of the LBO and Green Shoe Dividend received by Mr. Murphy in 2005.
Because the $10 million paid by plaintiffs exceeded the total amount earned by Mr. Murphy from the LBO and Green Shoe Dividend in 2005, plaintiffs invented a formula to approximate what they claim is the portion of the $10 million attributable to Mr. Murphy’s 2005 income from the LBO and Green Shoe Dividend. Applying that formula, plaintiffs estimated that 30.44% of the $5,000,000 forfeited to the United States, or $1,522,000, represents the portion of the 2005 LBO proceeds forfeited by plaintiffs. In addition, plaintiffs applied a formula to estimate that of the $5,000,000 paid to the Trustee, $234,359 represented the portion of the 2005 Green Shoe Dividend forfeited by plaintiffs. Defendant does not dispute these figures and the court accepts plaintiffs’ calculations as accurate estimates for purposes of determining the parties’ cross-motions.
On their amended 2005 return, plaintiffs reduced their net income from the disposition of property, see N.J.S.A. 54A:5-1c, by *440 $1,522,000. In addition, plaintiffs reduced their income from dividends, see N.J.S.A 54A:5-1f, by $234,359. This resulted in a decrease in their 2005 total income of $1,756,359. The reduction in taxable income also reduced plaintiffs’ gross income tax liability for tax year 2005, resulting in a request for a refund of $157,535.
On January 7, 2010, an auditor employed by the Director issued a letter to plaintiffs indicating that a review of their amended 2005 income tax return was completed and that their request for a refund was denied. The auditor determined that the $10 million paid in 2008 was a loss that took place in tax year 2008 and could not be used to offset income earned in tax year 2005. See N.J.S.A. 54A:5-2 (limiting the use of losses to offset income earned in the same tax year).
On January 27, 2010, plaintiffs filed a protest seeking a hearing at the Division to review the auditor’s letter.
On January 21, 2011, after conducting an informal administrative conference, the Director issued a final determination rejecting plaintiffs’ refund request. The Director relied, in part, on New Jersey Technical Advisory Memorandum # 7, issued by the Director just eight days earlier. Memorandum # 7 declares that for purposes of determining taxable income the Director adopts the “claim of right doctrine” embedded in federal law. The Memorandum explains that
[flor Federal Income Tax purposes, if a taxpayer must return income paid and already included in income, a deduction for this amount in the year of repayment is allowed under the “claim of right doctrine.” This doctrine states that if a taxpayer is required to restore amounts which previously have been included in income, the taxpayer is permitted a deduction in the year of repayment. The administration of this deduction in the year of repayment is governed by section 1341 of the Internal Revenue Code. This section provides a taxpayer with two alternate methods of calculating a claim of right adjustment. Under section 1341, the taxpayer may either take the deduction in the year of repayment or treat the amount as if the repayment had been excluded in the year the claim of right income was first reported.
The explanation of I.R.C. § 1341 in Memorandum #7 is not precise. Section 1341 allows the taxpayer to calculate the tax dm in the year of repayment in one of two ways. The taxpayer may either calculate the tax due in the year of repayment based on the amount of taxable income for that year after deduction of the *441 repayment, or the taxpayer may calculate the tax due in the year of repayment as the amount of tax due in the year of repayment without the deduction, minus the tax decrease that would have resulted had the repayment been deducted in the year the income was originally reported. Thus, section 1341 does not allow the taxpayer to reopen the year in which the income was originally reported, but merely provides a mechanism for determining the tax due in the repayment year. The Director’s final determination correctly notes that the GIT Act does contain a provision similar to I.R.C. § 1341.
Applying the claim of right doctrine, the Director determined that plaintiffs could not reduce their 2005 income because of the $10 million paid in 2008. He determined that plaintiffs’ only recourse was to consider the 2008 payment as a loss that occurred in tax year 2008.
Plaintiffs thereafter filed a timely Complaint in this court challenging the Director’s final determination. After discovery, the parties cross-moved for summary judgment. The court subsequently heard oral argument from counsel.
II. Conclusions of Law
Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court established the standard for summary judgment as follows:
[W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
“The express import of the Brill decision was to ‘encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.’ ” Township of Howell *442 v. Monmouth County Bd. of Taxation, 18 N.J.Tax 149, 153 (Tax 1999)(quoting Brill, supra, 142 N.J. at 541, 666 A.2d 146). The court concludes that this matter is ripe for decision by summary judgment. There are no material facts genuinely in dispute between the parties. The parties’ claims can be resolved through application of the law to the undisputed facts.
The court’s analysis of the parties’ arguments is guided by the familiar principle that the Director’s interpretation of tax statutes is entitled to a presumption of validity. “Courts have recognized the Director’s expertise in the highly specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J.Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984)). The scope of judicial review of the Director’s decision with respect to the imposition of a tax “is limited.” Quest Diagnostics, Inc. v. Director, Div. of Taxation, 387 N.J.Super. 104, 109, 903 A.2d 442 (App.Div.), certif. denied, 188 N.J. 577, 911 A.2d 69 (2006); International Business Machines Corp. v. Director, Div. of Taxation, 26 N.J.Tax 102, 107-08 (Tax 2011). The Supreme Court has directed courts to accord “great respect” to the Director’s application of tax statutes, “so long as it is not plainly unreasonable.” Metromedia, supra, 97 N.J. at 327, 478 A.2d 742. See also GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993) (“Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.”).
Plaintiffs contend that they made an overpayment of income tax for tax year 2005 because their original 2005 return included income which was, in part, forfeited by them in 2008. According to plaintiffs, the amount of income stated on their original 2005 return was incorrect because of a mistake of law or fact or both that may be corrected through the filing of an amended return. The Director, on the other hand, argues that plaintiffs’ refund claim is precluded by the claim of right doctrine, a concept embedded in federal law and, according to the Director, incorporated into the GIT Act, as recognized in Memorandum # 7 issued *443 shortly before issuance of the final determination in this matter. Both parties rely on the holding in Wigton v. Director, Div. of Taxation, 12 N.J.Tax 373 (Tax 1992), in support of their competing positions. The court declines to adopt the arguments advanced by either party and instead affirms the Director’s final determination based on the plain language and overall structure of the GIT Act.
Because the elected branches of government are solely empowered with the authority to determine tax policy in this State, a proper analysis of any tax claim begins with an examination of the relevant statutes. Where a taxpayer’s claim for a refund can be resolved through application of unambiguous provisions of the GIT Act, the court may not mandate a result contrary to those provisions. Such is the case here. Both the plain language and overall structure of the GIT Act lead to the conclusion that the tax is an annual assessment, based on discrete events that take place during the tax year. Income earned during a particular tax year must be included in the taxpayer’s taxable income for that year. Losses incurred during a particular tax year may only be used to offset income received in that year.
The annual nature of the GIT Act is made clear in several statutory provisions. “There shall be a tax for each taxable year (which shall be the same as the taxable year for federal income tax purposes) on the New Jersey gross income as herein defined of every individual____” N.J.S.A. 54A:2-1. The “‘[t]axable year’ means the calendar or fiscal accounting period for which a tax is payable under this act.” N.J.S.A. 54A:1-2k. As provided in N.J.S.A. 54A:8-1, “[w]ith respect to each taxpayer, the tax imposed by this act shall be due and payable annually, hereafter, in the manner provided in this section____”
The tax is imposed on sixteen distinct categories of income earned during the tax year. N.J.S.A 54A:5-1. Losses which occur in a particular tax year may be used to offset income earned in the same tax year and may not be applied to offset income from other tax years. N.J.S.A. 54A:5-2. Accord Marrinan v. Director, Div. of Taxation, 17 N.J.Tax 47 (Tax 1997); Estate of Guzzardi v. *444 Director, Div. of Taxation, 15 N.J.Tax 395 (Tax 1995), aff'd o.b., 16 N.J.Tax 374 (App.Div.1996).
One of the categories relevant to this matter is “[n]et gains or income from disposition of property.” N.J.S.A. 54A:5-lc. The category is defined as
[n]et gains or net income, less net losses, derived from the sale, exchange or other disposition of property, including real or personal, whether tangible or intangible as determined in accordance with the method of accounting allowed for federal income tax purposes. '
[N.J.S.A. 54A:5-1c]
Both the express language of N.J.S.A. 54A:5-1c and the eases interpreting that provision provide that capital gains income is earned when proceeds from the disposition of property are received by the taxpayer. DuBois v. Director, Div. of Taxation, 4 N.J.Tax 11 (Tax 1981), aff'd o.b., 6 N.J.Tax 249 (App.Div.1982), aff'd, 95 N.J. 234, 470 A.2d 446 (1983). This is so because the reference in N.J.S.A. 54A:5-1c to “the method of accounting allowed for federal income tax purposes” incorporates into the GIT Act federal accounting principles related to the recognition of gain, including the concept that taxpayers using the cash receipts and distributions method of accounting realize gain upon receipt of income.
As a general matter, the GIT Act was not modeled on the Internal Revenue Code. The Legislature chose, instead, to create an income tax based on a simpler system, shorn of many of the deductions and credits incorporated in federal law. Walsh v. Director, Div. of Taxation, 15 N.J.Tax 180, 185 (App.Div.1995); Scully v. Director, Div. of Taxation, 19 N.J.Tax 553 (Tax 2001), aff'd, 21 N.J.Tax 108 (App.Div.2003); Tischler v. Director, Div. of Taxation, 17 N.J.Tax 283 (Tax 1998). However, where a provision of the GIT Act expressly incorporates federal tax concepts, the legislative directive must be respected. Smith v. Director, Div. of Taxation, 108 N.J. 19, 33, 527 A.2d 843 (1987). This is the ease with N.J.S.A. 54A:5-1c, which was “enacted by the Legislature with federal income tax concepts in mind----” Baldwin v. Director, Div. of Taxation, 10 N.J.Tax 273, 284 (Tax 1988), aff'd, 237 N.J.Super. 327, 567 A.2d 1021 (App.Div.1990).
*445 Methods of accounting for federal income tax are governed by I.R.C. § 446, which provides that a taxpayer may compute taxable income under the cash receipts and disbursements method, accrual method, or any other method permitted by federal regulation. Plaintiffs used the cash receipts and disbursement method to account for their income in 2005. Pursuant to Treasury regulation 26 C.F.R. 1.446-l(c)(l):
Generally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. Expenditures are to be deducted for the taxable year in which actually made____
In DuBois, supra, this court expounded on the significance of the GIT Act’s recognition of the federal method of accounting for purposes of calculating capital gains:
[T]he Legislature has accepted all accounting methods recognized by the Code and the Regulations. It is obvious that the Legislature’s purpose was to adopt a simple procedure for the determination and timing of income and deductions, in accordance with federal income tax accounting principles. Therefore, for New Jersey Gross Income Tax returns, a federal cash-basis taxpayer reports his income as “earned” upon actual or constructive receipt....
[4 N.J.Tax at 23.]
Thus, in DuBois, a taxpayer who sold property in a year prior to the enactment of the GIT Act, but who received an installment payment from the sale in a year after the GIT Act became effective was subject to tax on the installment payment in the year that it was received. Id. at 25-26. Accord Estate of Guzmrdi, supra, 15 N.J.Tax at 895 (recognizing that taxpayer who established residence in New Jersey in tax year in which she received final installment of multi-year payment from sale of out-of-State property subject to gross income tax on final payment).
Here, plaintiffs realized capital gains income from the LBO during 2005. There can be no dispute that more than $4 million from the LBO came into plaintiffs’ possession and unfettered control during 2005. While claims were filed in 2007 against plaintiffs with respect to their receipt of funds from the LBO, nothing in the record suggests that plaintiffs were inhibited in their use, investment or enjoyment of the LBO proceeds during *446 2005 or the nearly two years prior to the initiation of suit by the federal government and Trustee.
Similarly, plaintiffs received possession and unfettered control of the Green Shoe Dividend during 2005 and enjoyed the use of that money without limitation until claims were filed by the federal government and Trustee in 2007. The relevant statutory provision for “[dividends” appears at N.J.S.A. 54A:5-lf. That category of income is defined in relevant part as
any distribution in cash or property made by a corporation, association or business trust that is not an S corporation, (1) out of accumulated earnings and profits, or (2) out of earnings and profits of the year in which such dividend is paid and any distribution in cash or property made by an S corporation, as specifically determined pursuant to section 16 of P.L.1993, c. 173 (C.54A:5-14).
[N.J.S.A. 54A:5-1f.]
N.J.S.A. 54A:5-1f does not incorporate federal methods of accounting with respect to the recognition of dividends. As a result, the analysis of when a dividend is received is based on the plain language of the statute. Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992). “A statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one interpretation.” Board of Educ. v. Neptune Twp. Educ. Ass’n, 144 N.J. 16, 25, 675 A.2d 611 (1996) (quotations omitted). “[T]he best approach to the meaning of a tax statute is to give to the words used by the Legislature their generally accepted meaning, unless another or different meaning is expressly indicated.” Public Serv. Elec. & Gas Co. v. Township of Woodbridge, 73 N.J. 474, 478, 375 A.2d 1165 (1977) (quotations omitted); Vassilidze v. Director; Div. of Taxation, 24 N.J.Tax 278, 291 (Tax 2008).
The Green Shoe Dividend was distributed to Mr. Murphy when cash was placed in his account by Refco, Inc. in 2005. This proposition is too plain to require extended discussion.
This is not a situation in which the taxpayer received an illusory payment, the return of capital or an asset, the value of which was falsely reported to plaintiffs. Plaintiffs received more than $4.5 million in cash during 2005. They had full control and use of those funds during the tax year and the following two years. *447 Plaintiffs, therefore, properly reported the proceeds of the LBO and Green Shoe Dividend as income on their tax year 2005 gross income tax return to reflect accurately the income they realized during that year.
Having determined that plaintiffs properly reported the proceeds of the LBO and Green Shoe Dividend as income on their 2005 return, the court turns to the question of whether plaintiffs are entitled to amend that return to reduce the income reported.
N.J.S.A. 54:49-14a provides that
[a]ny taxpayer, at any time within four years after the payment of any original or additional tax assessed against him, unless a shorter limit is fixed by the law imposing the tax, may file with the director a claim under oath for refund, in such form as the director may prescribe, stating the grounds therefore____
The GIT Act provides for a period of less than four years for a claim for a refund of gross income tax. N.J.S.A. 54A:9-8 (“Claim for credit or refund of an overpayment of income tax shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires later, or if no return was filed, within 2 years from the time the tax was paid.”). There is no dispute that plaintiffs’ refund claim was timely filed.
N.J.S.A. 54A:9-7(a) provides that the
Director, within the applicable period of limitations may credit an overpayment of income tax against any liability in respect to any tax imposed by the tax law on the person who made the overpayment, and the balance shall be refunded by the comptroller out of the proceeds of the tax retained by him for such general purpose. Any refund under this section shall be made only upon the filing of a return and upon a certificate of the director approved by the comptroller.
Plaintiffs contend that because they ultimately elected to, in effect, forfeit a portion of the income Mr. Murphy received from Refeo, Inc. in 2005 their 2005 return overstates plaintiffs’ income for that year. According to plaintiffs, they are entitled to amend their return to correct this inaccuracy, reduce their income tax liability for 2005 and claim a refund on their overpayment of taxes. The fault with plaintiffs’ argument is that it is their proposed amended return that contains the inaccuracy, not their original return. The record convincingly establishes that plaintiffs in fact received $4,142,000 in September 2005 from the LBO and $381,558 *448 on August 18, 2005 from the Green Shoe Dividend. Those funds were placed in the unfettered possession and control of plaintiffs. That the federal government and Trustee two years later asserted legal claims seeking to disgorge those funds from plaintiffs does not alter the fact of receipt and control of those funds by plaintiffs in 2005.
Nor was there a determination during 2005 that plaintiffs were not legally entitled to the income they received that yeai\ Indeed, no legal determination with respect to plaintiffs’ entitlement to the proceeds of the LBO and Green Shoe Dividend has ever been made by a court or conceded by plaintiffs. Plaintiffs elected in 2008 to settle claims concerning not only the income received by Mr. Murphy in 2005, but also income he received from Refco, Inc. in prior years. Plaintiffs consistently maintained the position that Mr. Murphy was the innocent recipient of the income at issue, that forfeiture to the federal government was not supported by law, and that the bankruptcy Trustee did not have a claim to the funds from the LBO and Green Shoe Dividend. In order to settle those claims, plaintiffs made total payments of $10 million without admitting the validity of the claims asserted against them. Plaintiffs allege that they agreed to the settlement to avoid counsel fees and to preserve Mr. Murphy’s reputation as a corporate executive, which might have been tarnished if the claims had been brought to trial. These are perfectly acceptable reasons to settle litigation. However, having elected to resolve the claims asserted against them, plaintiffs also chose to forgo a judicial determination of whether they were entitled to the funds they received from the LBO and Green Shoe Dividend in 2005.
The purpose of N.J.S.A. 54:49-14a and N.J.S.A. 54A:9-7(a) is to permit taxpayers to amend returns to correct inaccuracies in the original filings. Here, plaintiffs’ original returns are accurate and the proposed amended return would not correct a factual or legal error in the original return, but rather would introduce inaccurate information into the 2005 return.
A separate, but no less compelling, ground supporting denial of plaintiffs’ refund claim is N.J.S.A. 54A:5-2. That provi *449 sion, which is a key component of the GIT Act’s annual structure, provides:
Losses which occur within one category of gross income may be applied against other sources of gross income within the same category of gross income during the taxable year. However, a net loss in one category of gross income may not be applied against gross income in another category of gross income.
[N.J.S.A. 54A:5-2.]
It is firmly established that this provision does not allow a taxpayer to apply losses from one tax year to offset income in another tax year. Marrinan, supra; Estate of Guzzardi, supra. Unlike the Internal Revenue Code, the GIT Act does not allow for the carry forward or carry back of losses, underlining the annual nature of the State tax. It is not entirely clear which, if any, category of loss would embrace plaintiffs’ $10 million in payments in 2008. Plaintiffs, in effect, seek to apply the payments to offset capital gains and dividend income. The Director’s final determination characterizes the payments as a “deduction” which can be taken in 2008. In his brief in support of his cross-motion for summary judgment, the Director raises the question of whether the $10 million constitutes a loss at all, given that plaintiffs received consideration-—-a release of liability associated with the Refco, Inc. fraud—in exchange for the payments. It may well be true that the $10 million in payments has no impact on plaintiffs’ state income tax liability. Not every expense paid by a taxpayer may be used to offset income.
The court, however, need not determine the legal significance of plaintiffs’ payments to the federal government and Trustee. It is clear to the court that whatever meaning the payments may have under the GIT Act, the payments occurred in 2008. N.J.S.A. 54A:5-2 does not permit a 2008 event, whether it is a loss, a deduction, or some other legally significant transaction, to be applied to offset 2005 income. If the 2008 payments have any impact on plaintiffs’ income tax liability, they must be reported on plaintiffs’ 2008 income tax return. To permit the payments to reduce plaintiffs’ 2005 income would contravene a plainly stated legislative directive that the tax be assessed on an annual basis.
Plaintiffs’ reliance on the holding in Wigton, supra, in support of their position is misplaced. In that case, the taxpayers in their *450 capacity as stockholders received, in 1985, liquidating distributions of over $15 million from a corporation. The distributions were reported on their 1985 gross income tax return. 12 N.J.Tax at 375. In 1986, a civil action was instituted by stockholders of the corporation. In 1989, the taxpayers entered into a settlement agreement terminating the civil action. As part of the settlement, the taxpayers “agreed to restore to the stockholders” approximately $1.9 million of the distribution. The payment was made in 1989. Ibid. In 1990, the taxpayers filed an amended gross income tax return for tax year 1985 “setting forth the reduction in their 1985 capital gain and seeking a gross income tax refund” based on the 1989 payment. Id. at 376. The Director denied the refund as time-barred because it was filed beyond the three-year limitations period. Ibid.
The timeliness of the amended return was the only issue resolved by Judge Lasser. The taxpayer argued that the amended return was timely under N.J.S.A. 54A:8-7, which provides that
[i]f the amount of a taxpayer’s federal taxable income or earned income tax credit reported on the taxpayer’s federal income tax return for any taxable year is changed or corrected by the United States Internal Revenue Service or other competent authority, or as the result of a renegotiation of a contract or subcontract with the United States, the taxpayer shall report such change or correction in federal taxable income or earned income tax credit within 90 days after the final determination of such change, correction, or renegotiation, or as otherwise required by the director, and shall concede the accuracy of such determination or state wherein it is erroneous. Any taxpayer filing an amended federal income tax return shall also file within 90 days thereafter an amended return under this act, and shall give such information as the dix-ector may x’equii'e. The dii’ector may by x-egulation pi’esciibe such exceptions to the i’equii-ements of this section as the dii’ector deems appropi-iate.
N.J.S.A. 54A:9-8(c) provides that a taxpayer required by N.J.S.A. 54A:8-7 to report a change or correction in federal taxable income or to report a change or correction which is treated in the same manner as if it were an overpayment for federal income tax purposes, may file a claim with the Director for a refund of New Jersey gross income tax based on the federal change within two years of the time in which the filing of the notice of change was required.
The taxpayers in Wig ton argued that the three-year limitation period for filing their amended return was extended pursuant to *451 the statute by virtue of the fact that in 1990, on the taxpayers’ request, the federal government had reduced the taxpayers’ 1989 federal tax liability under the claim of right doctrine. Id. at 375-76. The court rejected this argument.
Judge Lasser set forth a comprehensive explanation of the claim of right doctrine, which he described as a federal “judge-made doctrine.” Id. at 377. Simply stated, pursuant to the doctrine “if a taxpayer is required to return amounts which previously have been included in income, the taxpayer is permitted a deduction in the year of repayment.” Ibid, (citing North Am. Oil Consolidated v. Burnet, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197, 1200-01 (1932)). The court noted that after several judicial opinions in 1951 and 1952 recognized the potential inequities resulting from this judicially crafted remedy, Congress adopted I.R.C. § 1341. As noted above, that provision gives the taxpayer two options for calculating the tax due in the year of repayment: either (1) the tax due with the deduction in the year of repayment; or (2) the tax due in the year of repayment without the deduction minus the tax decrease that would have resulted had the repayment been deducted in the year the income was originally reported. Id. at 378.
Judge Lasser noted that “[fjederal and state case law interpreting § 1341 holds that this section does not result in reopening of the earlier taxable year.” Id. at 378 (citing United States v. Shelly Oil, 394 U.S. 678, 680-81, 89 S.Ct. 1379, 1381, 22 L.Ed.2d 642, 647 (1969); North Am. Oil, supra; Kreiss v. New York State Tax Comm’n, 61 N.Y.2d 916, 474 N.Y.S.2d 717, 463 N.E.2d 33 (1984)). He continued, “[t]he prior year is simply used as a means of determining the least amount of tax due under the § 1341 recalculation” in the year of repayment. Id. at 378.
The court concluded that because the federal government “did not change or correct the taxpayers’ 1985 federal income tax return but merely used it as the basis for determining the appropriate § 1341 adjustment to be made as a result of repayments taxpayers made in 1989,” the three-year statute of limitations for filing a refund claim in New Jersey was not extended *452 pursuant to N.J.S.A. 54A:9-8(c). Id. at 380. Judge Lasser stated his holding succinctly:
I find that taxpayers may not rely on the extension provided in N.J.S.A. 54A:9-8(c) and :8-7 to pursue a claim for a 1985 state income tax refund based on changes made to their 1989 federal income tax return.
Taxpayers’ claim for a 1985 New Jersey gross income tax refund, having been made beyond the three-year statute of limitations period, is denied.

[Ibid.]

Wigton, therefore, is quite simply a limitations case. The only issue before Judge Lasser was whether the Director correctly determined that the taxpayers’ 1985 refund claim was timely filed. This is the only issue he analyzed in his opinion and the only issue embraced by the holding of the court.
Plaintiffs argue that Wigton stands for the proposition that a taxpayer may file a timely claim for refund with respect to tax paid on income that had to be repaid in a subsequent year if the three-year limitations period is open for the earlier year. In their reply letter brief, plaintiffs argue that they “are seeking nothing less than what Judge Lasser said in Wigton was available, namely filing a timely claim for refund for the year in which the income was reported when such income had to be paid in a later year.” Nothing in the Wigton opinion, however, suggests that the court made such a holding. The opinion contains no mention or analysis of whether the taxpayers’ refund request, if it had been timely filed, would have been supported by law. The court did not reach that issue, as the only question before the court was whether the refund claim had been untimely filed. The holding in Wigton does not support plaintiffs’ position.[1]
*453 Nor, as the Director appears to suggest, does the Wigton opinion recognize that New Jersey courts have adopted the claim of right doctrine for purposes of implementing the GIT Act. The Wigton court examines the doctrine only to determine whether the time in which to file a refund claim was extended pursuant to N.J.S.A. 54A:9-8(c). It is, of course, a dubious proposition that this court has the authority to insert into the GIT Act a method of recognizing income and losses not expressly adopted by the Legislature. This is particularly true where the accounting method at issue was crafted by federal judges to remedy perceived gaps in the Internal Revenue Code. It is well-established that the state and federal income tax statutes are distinct compilations, Smith, supra, and only where the Legislature had expressly adopted federal concepts may the courts resort to federal tax law to interpret the GIT Act. The Director points to no convincing passage in Wigton indicating a legislative incorporation into New Jersey law of the federal courts’ creative interpretation of the federal tax statutes.
This court, moreover, need not resolve the question of whether the federal claim of right doctrine applies in this State. As noted above, plaintiffs’ claims can readily be decided by the plain language of N.J.S.A. 54A:5-1 and 5-2, as well as by the overall structure of the GIT Act as an annual assessment on income. Those provisions provide that a taxpayer using a cash basis of accounting must report income in the year received, and may apply a loss, if one exists at all, to offset income received in the year that the loss occurred. The sum and substance of the claim of right doctrine is reflected in our existing statutes, rendering academic the question of whether the doctrine may be imposed on the GIT Act by the courts and whether the Director’s issuance of Memorandum # 7 violated the Administrative Procedures Act, N.J.S.A. 52:14B-4(a)(1), as alleged by plaintiffs.
*454 Plaintiffs claim that they will suffer an inequity if not permitted to amend their 2005 return and are required to follow the Director’s interpretation of the GIT Act. According to plaintiffs, considering the 2008 payment as a loss for tax year 2008 is not useful for them because they have a net capital loss in that year even without consideration of the $10 million in payments. The fact that a taxpayer may have excess capital losses which cannot offset income in a particular tax year was contemplated by the Legislature, given that N.J.S.A. 54A:5-2 does not permit losses to be carried forward, carried back, or applied to income from categories other than the category which generated the loss. If plaintiffs believe that the GIT Act is inequitable in its treatment of excess capital losses, they must direct their complaint to the elected branches of government, which hold the power to amend the GIT Act.[2]
As a final note, the court highlights another question that it does not decide today: whether the funds received by plaintiffs from the LBO and Green Shoe Dividend are subject to gross income tax in tax year 2005 as “[ijneome, gain or profit derived from acts or omissions defined as crimes or offenses under the laws of this State or any other jurisdiction.” N.J.S.A. 54A:5-lo. The parties did not address this question in their briefs. As a result, the court offers no view on whether the provision applies to beneficiaries of criminal activity who themselves committed no crime and were unaware of the criminal nature of the acts that generated the income they received.
The taxpayers’ motion for summary judgment is denied. The Director’s cross-motion for summary judgment is granted. The court will issue Judgment affirming the final determination of the Director, Division of Taxation.

 The court notes that even if the Wigton opinion can be stretched to stand for the proposition that the taxpayers’ refund claim would have been authorized by law had it been timely filed, this court is not bound by the holding of another trial court. In addition, such a holding would be dictum, because the validity of the Director’s final determination in that case could be determined solely on timeliness grounds. Dictum is a statement by a judge "not necessary to the decision then being made” and as such is "entitled to due consideration but does not invoke the principle of stare decisis." Jamouneau v. Division of Tax Appeals, 2 N.J. 325, 332, 66 A.2d 534 (1949). "[P]ortions of an opinion that are dicta are not binding.” National Mortgage Co. v. Syriaque, 293 N.J.Super. 547, 554, 681 *453 A.2d 1232 (Ch.Div. 1994) (citing Township of West Milford v. Garfield Recreation Committee, Inc., 194 N.J.Super. 148, 476 A.2d 333 (Law Div.1983)).

 Plaintiffs concede that application of the $234,359 dividend "loss” in 2008 would benefit plaintiffs, as they had dividend income from other sources in that tax year.