NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**MARY SIOBHAN BRENNAN**
JUDGE

Essex County Dr. Martin Luther King, Jr. Justice
Building 495 Martin Luther King Blvd. - Fourth Floor
Newark, New Jersey 07102-0690
(609) 815-2922 Ext. 54600
Fax: (973) 424-2424

January 19, 2022

James Esposito, Esquire
Law Office of James Esposito, LLC
378 Bloomfield Avenue, Suite 6
Caldwell, New Jersey 07006

Quentin Sigel, Esquire, Pro Hac Vice
Josh Veith, Esquire, Pro Hac Vice
Ryan Law Firm, PLLC
Terrace I
2600 Via Fortuna Drive
Suite 150
Austin, Texas 78746

Heather Lynn Anderson, Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
PO BOX 106
Trenton, NJ 08625-0106

Filed on ECourts

> Re:  **SOLVAY SPECIALTY POLYMERS, LLC v. DIRECTOR, DIVISION OF TAXATION**
> Docket No.   009365-2019
>
> **SOLVAY SOLEXIS, INC.  v. DIRECTOR, DIVISION OF TAXATION**
> Docket No.   009366-2019






Dear Counsellors:

This letter opinion sets forth the court's ruling on plaintiffs' motions for partial summary judgment,[1] and defendant's cross motions for summary judgment. Plaintiffs request that the court (1) find N.J.A.C. 18:2-5.8(d)(3) and (4) invalid; (2) award plaintiffs a refund in the amount of $155,028.20; and (3) vacate the defendant's refund offset as time barred by the statute of limitations. Defendant asks the court to uphold its Final Determination and validate the challenged regulations. For the reasons explained more fully below, the court upholds the validity of N.J.A.C. 18:2-5.8(d)(3) and (4), finds that there are genuine issues of material fact as to the refund claim, and vacates the refund offset as time barred.

I. Findings of Fact and Procedural History

The following procedural history and findings of fact are based on pleadings of record and the certifications submitted in the moving papers.

Plaintiffs Solvay Solexis, Inc. ("Solexis") and Solvay Specialty Polymers, LLC ("Polymers") are Delaware corporations with a principal place of business in West Deptford, New Jersey. On November 1, 2012, Solexis merged with Polymers as part of a company reorganization. All operations, including financial matters were unchanged. For purpose of this motion, Solexis and Polymers are collectively referred to as ("Solvay" or "Plaintiff.")

Solvay is primarily engaged in the manufacturing and distribution of fluorine-based specialty chemicals[2] that are used in the semiconductor, automotive, and chemical process industries. During the period July 1, 2011 through December 31, 2013, Solvay manufactured and

---

[1] Plaintiffs' Motion for Partial Summary Judgment addresses counts one, two, twelve, and nineteen of Solexis's and Polymer's Complaints.

[2] Solvay produces essential chemicals such as soda ash, hydrogen peroxide, and sodium bicarbonate.

sold polyvinylidene fluoride ("PVDF") polymers in pellet form and manufactured and sold a rubber product called Tecnoflon.

To manufacture PVDF and Tecnoflon, Solvay utilized a multistep manufacturing process that transformed raw materials into two different intermediate chemical products referred to as "142b" and "VF2." Specifically, Solvay operated four production units at its manufacturing plant to manufacture PVDF and Tecnoflon. The first unit, called the 142b unit, produced an intermediate chemical product referred to as the 142b product. Manufacturing the 142b product required multiple steps that used equipment such as pumps, piping, instrumentation, heaters/coolers, and tanks/vessels to produce the 142b product. Solvay began this process by feeding raw materials into a vessel. Once in the 142b unit, the raw materials transformed into the 142b product through a multistep process involving reactions and separations that occurred in vessels and distillation columns.

Once the 142b product was manufactured, Solvay processed the 142b product in a second unit. The second unit, called the VF2 unit, created a second intermediate chemical product referred to as the VF2 product. Like the process to manufacture the 142b product, manufacturing the VF2 product required a multistep process that utilized the VF2 unit's pumps, piping, instrumentation, heaters/coolers, and tanks/vessels. Solvay also used equipment such as dryers, scrubbers, and distillation columns to physically change the characteristics of the VF2 product.

Once Solvay completed the VF2 product, Solvay used pumps to feed the VF2 product into the final PVDF and Tecnoflon production units. Like the 142b unit and the VF2 unit, the final production units consisted of pumps, piping, instrumentation, heaters/coolers, and tanks/vessels, including washing vessels, mixing vessels, and thickening vessels, to manufacture PVDF and Tecnoflon.

Part of Solvay's manufacturing process required drying the product—i.e., converting the chemical product from a liquid to a solid. Solvay used pumps to feed the product into the dryers. In addition, part of Solvay's manufacturing process involved shaping the solid product into pellets. To do so, Solay utilized pumps and solids handling equipment to feed material into an extruder that shaped the product into pellets.

Solvay maintains that repair part purchases made during the period between July 1, 2011 and December 31, 2013 were used directly and primarily in Solvay's manufacturing operations and were exempt from New Jersey Sales and Use Tax ("SUT").[3] Solvay contends that these repair parts were components of machinery and equipment that Solvay used in its manufacturing process. Solvay also purchased instrumentation that its personnel used to control the equipment used in its manufacturing process. Solvay states that the useful life of the instrumentation was at least one year and thus should also be exempt from SUT.

On July 27, 2015, Solvay filed a refund claim with the New Jersey Division of Taxation ("Division") in accordance with N.J.A.C. 18:22-5.8(d)(2) for their manufacturing equipment, repair parts, and supplies used in the production of the chemicals mentioned above. Solexis claimed a refund of $577,157.78 and Polymers claimed a refund of $901,974.53.

To file a refund claim, the Division mandated that Solvay complete Form A-3730, which required that Solvay provide a detailed explanation as well as supporting documentation to substantiate the refund claim. To demonstrate that Solvay paid the SUT that it sought a refund for, Solvay submitted the following information:

---

[3] During the period at issue, Solexis paid $71,788.04 in SUT on the purchased repair parts and Polymers paid $83,240.16 in SUT on the purchased repair parts.

a. Solvay's SAP[4] data from the period at issue;

b. Solvay's EFT[5] Debit reports with ACH[6] data from the period at issue;

c. A sample of written and signed confirmation letters from Solvay's vendors stating that payment of the tax at issue was received by the vendors in full;

d. Invoices from the vendors;

e. Internal reports from Solvay's accounting system that provided the reference numbers necessary to trace line items on bank statements to particular payments and invoices; and

f. Bank statements with check number or EFT Identification Numbers that corresponded to Solvay's internal report.

On February 15, 2017, the Division denied Solvay's refund requests for its replacement part purchases; the Division contended that Solvay failed to prove it paid SUT on the purchases that Solvay sought refunds for as required by N.J.A.C. 18:2-5.8(d)(3) and (4). In response, Solvay filed written protests to the Division's denial on May 18, 2017.

On November 14, 2018, a conference was held between Solvay and the Division. At the conference, the Division's conferee explained that she intended to offset any approved refunds against a deficiency in Solvay's use tax reconciliation from the period at issue. Specifically, the offset applied to credits that Solvay took on its tax returns during the period at issue. None of the credits were included in or related to Solvay's refund claims.

The Division filed Final Determinations on May 19, 2019, upholding in part their previous denial of Solvay's request; the Division reasoned that Solvay failed to provide the adequate

---

[4] Systems, Applications and Products.

[5] Electronic Fund Transfer.

[6] Automatic Clearing House.

documentation to prove accrued SUT was remitted. The refund amounts determined by the Division were as follows:

- **Solexis Refund Amount**: $162,059.02 in use tax overpayments and $3,659.09 in sales tax overpayments, for a total of $165,718.11. The Division offset the refund amount by $372,317.04 in use taxes owed. Thus, according to the Division, Solexis owed $210,258.02 in use tax plus any accrued interest.[7]

- **Polymers Refund Amount**: $263,061.89. The Division offset the refund amount by $186,476.30. Thus, Polymers received a refund total of $76,585.59 with no taxes owed.[8]

In response, Solvay filed this action on June 18, 2019. The Division filed its Answer on July 23, 2019. On July 30, 2021, at the conclusion of discovery, Solvay filed Motions for Partial Summary Judgment. The Director responded on October 11, 202, with a reply brief and Cross-Motions for Summary Judgment. Solvay responded to the Director's reply and cross-motion on November 29, 2021.

Oral argument was heard via ZOOM on January 7, 2022.

## II. Issues Presented

1. The validity of the administrative regulations found in N.J.A.C. 18:2-5.8(d)(3) and (4);

2. The determination of SUT exemption related to Solvay's purchases of certain repair parts pursuant to N.J.S.A. 54:32b-8.13(a); and

---

[7] Regarding Solexis' refund claim for $577,157.78, the Division granted Solexis a refund of $162,059.02 in use tax overpayments and $3,659.09 in sales tax overpayments. The Division denied the remaining $411,439.67. In addition, the Division completely offset Solexis' refund of $165,718.11, because the Division concluded that Solexis had accrued, but did not remit, $372,317.04 in use tax.

[8] Regarding Polymers' refund claim for $901,974.53, the Division granted Polymers a refund of $263,061.89 and denied the remaining $638,912.64. The Division offset Polymers' refund claim by $186,476.30. Thus, Polymers only received a refund of $76,585.59.

3. The determination of whether the Division improperly assessed additional tax outside of the statute of limitations.

### III. Conclusions of Law

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995), our Supreme Court established the standard for summary judgment as follows:

> [W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

"The express import of the Brill decision was to 'encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.'" Township of Howell v. Monmouth Cnty Bd. of Taxation, 18 N.J. Tax 149, 153 (Tax 1999) (quoting Brill, supra, 142 N.J. at 541).

The court concludes that issues one and three are ripe for summary judgment. As to the validity of N.J.A.C. 18:2-5.8(d)(3) and (4) and the statute of limitations question, there are no genuine issues with respect to the material facts in dispute between the parties.

### IV. Analysis

The review of this matter begins with the presumption that determinations made by the Director, Division of Taxation ("Director") are valid. See Campo Jersey, Inc. v. Director, Div. of

7

Taxation, 390 N.J. Super. 366, 383 (App. Div. 2007), certif. denied, 190 N.J. 395 (2007); L&L Oil Service, Inc. v. Director, Div. of Taxation, 340 N.J. Super. 173, 183 (App. Div. 2001); Atlantic City Transp. Co. v. Director, Div. of Taxation, 12 N.J. 130, 146 (1953). "New Jersey Courts generally defer to the interpretation that an agency gives to a statute [when] that agency is charged with enforc[ement.]" Koch v. Director, Div. of Taxation, 157 N.J. 1, 15 (1999). Determinations by the Director are afforded a presumption of correctness because "[c]ourts have recognized the Director's expertise in the highly specialized and technical area of taxation." Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J. Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327 (1984)).

It is the taxpayer who bears the burden of proving the Director's determination is incorrect, and the taxpayer may do so only by evidence that is sufficiently "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105 (1952). Claimed exemptions must be narrowly construed, and all doubts resolved against the taxpayer. Quest Diagnostics, Inc. v. Dir., Div. of Taxation, 387 N.J. Super. 104, 109-10, 23 N.J. Tax 278, (App. Div.), certif. denied, 188 N.J. 577 (2006).

The Supreme Court directed courts to accord "great respect" to the Director's application of tax statutes, "so long as it is not plainly unreasonable." Metromedia, supra, 97 N.J. at 327. See also GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306 (1993) ("Generally, courts accord substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.") However, judicial deference is not absolute. An administrative agency's interpretation that is plainly at odds with a statute will not be withheld. See Oberhand v.

Director, Div. of Taxation, 193 N.J. 558, 568 (2008) (citing GE Sold State, supra, 132 N.J. at 306); Advo, Inc. v. Director, Div. of Taxation, 25 N.J. Tax 504, 511 (Tax 2010).

The court is also cognizant that public policy discourages suits for the refund of taxes erroneously paid or illegally collected. As government budgets are prepared on an annual cash basis, in the absence of a statutory limitation on the time in which a taxpayer may file suit, governments would be subject to substantial liabilities from refunds for unlimited periods of time. Accordingly, in the absence of statutory authority, taxes voluntarily, although erroneously, paid cannot be refunded. Therefore, if taxes cannot be refunded in the absence of statutory authority, there can be no argument that when the Legislature does provide for refunds there must be strict compliance with its direction. See Great Adventure, Inc. v. Director, Division of Taxation, 9 NJ Tax 480, 484-85 (1988).

N.J.S.A. 54:32B-20(a), a section of the Sales and Use Tax Act, permits a refund to be made as follows:

> In the manner provided in this section the director shall refund or credit any tax, penalty or interest erroneously, illegally or unconstitutionally collected or paid if application to the director for such refund shall be made within four years from the payment thereof. Such application may be made by a customer who has actually paid the tax. Such application may also be made by a person required to collect the tax, who has collected and paid over such tax to the director, provided that the application is made within four years of the payment to him by the customer, but no actual refund of moneys shall be made to such person until the person shall first establish to the satisfaction of the director, under such regulations as the director may prescribe, that the person has repaid to the customer the amount for which the application for refund is made. The director may, in lieu of any refund, allow credit on payments due from the applicant.
>
> [N.J.S.A. 54:32B-20(a).]

The Supreme Court in T.H. v. Div. of Developmental Disabilities, 189 N.J. 478, 490 (2007), declared that the Legislature may delegate power to agencies to "promulgate rules and regulations that interpret and implement [the] statute." Although the Legislature provides the Director with the power to establish administrative rules, these regulations "may not undermine legislative intent by giving a statute 'greater effect than its language permits' under the guise of interpretation." GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 306 (1993) (citing Kingsley v. Hawthorne Fabrics Inc., 41 N.J. 521, 528 (1964)).

The Director's regulations regarding SUT refund claims include the following:

> d) For sales tax (other than urban enterprise zone refunds):
>
> 2. Individual refunds: If the taxpayer overpaid sales tax when making a retail purchase, the taxpayer may request a refund directly from the seller from whom the purchase was made. However, if the seller has already submitted the tax to the State, the taxpayer must complete a Claim for Refund (Form A-3730) and include supporting documents to substantiate the claim.
>
> 3. Refund claims of sales and use tax must include documentation of all transactions to substantiate the tangible personal property or service that is the subject of the refund claim and the amount requested. Documentation required is as follows:
>
>> i. The Claim for Refund (Form A-3730) must be filed with documents, such as invoices, receipts, proof of payment of tax, and exemption certificates. These documents must be provided in a format suitable to determine the correctness of the grounds for the refund and the amount of the refund or credit. Acceptable formats include photocopies or in lieu of paper copies, imaged documents. Imaged documents, which can be read with universal readable software, such as Adobe PDF and presented on CD may be submitted if first:
>>
>>> (1) The taxpayer submits a proposed plan for the submission to the Sales Tax Refund Section and received a written approval; and

10

**(2)** In claims of 25 or more transactions, the images of the documents are presented in an organized manner, which permits examination of the documents together with an electronic spreadsheet listing the transaction (see (d)4 below) and the taxpayer retains the original invoices for Division examination;

**ii.** All sales/purchase documentation must clearly identify the seller, purchaser, invoice number, invoice date, description of the transaction, amount of the invoice excluding the tax, and the amount of sales tax billed for the transaction. For those transactions exempt from sales tax by the tendering of an exemption certificate, the documentation relevant to all transactions with the issuer of the exemption certificate must clearly identify the purchaser. Cash receipts, register tapes or other receipts that do not identify the purchaser are not acceptable;

**iii.** Proof of payment for sales/use tax remitted.
   **(1)** Proof of sales tax remitted to sellers is required and the Division will accept copies of canceled checks. If payment was made electronically, the Division will accept copies of bank statements with an itemization of all the transactions that make up the electronic payment. A request for use of an alternative proof of payment must be requested in writing to the Sales and Use Tax Refund Section and written approval received by the claimant prior to submission of such alternative proof of tax payment in support of the refund claim. Any approved alternate proof of payment must provide a trail between the documents presented by use of notation, highlighting, or other identification of the particular matching transactions.

   **(2)** Proof of use tax accrual and remittance is required and the Division will accept copies of detailed journal entries or detailed listings previously prepared by the taxpayer in determining the use tax liability as reported on

> the ST-50 Sales and Use Tax Quarterly Return, an ST-18 Use Tax Return, an ST-18B Annual Business Use Tax Return, or on the Gross Income Tax Individual Return NJ-1040. Payment of use tax will be confirmed from Division records;

[N.J.A.C. 18:2-5.8(d)(3) and (4).]

With the statute and regulations in mind, the court resolves the arguments put forth by the parties.

A.  N.J.A.C. 18:2-5.8(d)(3) and (4) Are Valid Administrative Regulations.

Solvay argues N.J.A.C. 18:2-5.8(d)(3) and (4) are invalid administrative rules because they add language to N.J.S.A. 54:32B-20(a), contradict N.J.S.A. 54:32B-20(a), 54:48-3 and 54:32B-46, and are arbitrary and capricious.

N.J.A.C. 18:2-5.8(d)(3) and (4) may not provide the Director with more power and discretion than is allotted to him/her by N.J.S.A. 54:32B-20(a). The Court's role is to determine the Legislature's intent behind passing N.J.S.A. 54:32B-20(a). See In re Agricultural, Aquacultural, and Horticultural Water Usage Certification Rules, 410 N.J. Super. 209, 224 (App. Div. 2009). To determine the Legislature's intent, the Court looks to the plain meaning of the statute at issue. Id.

1. The Rules Do Not Add Language to N.J.S.A. 54:32B-20(a)

Pursuant to N.J.S.A. 54:32B-20(a) ("54:32B-20(a)"), a person who has collected the tax may receive a refund or credit if the application is made within 4 years, and the applicant "establish[es] to the satisfaction of the director, under such regulations as the director may prescribe" that the person who collected the tax has repaid to the customer the refund amount in the application.

Solvay purports that the administrative regulations add language to the above statute. The statute utilizes discretionary language and purposefully lacks any restrictive terminology, especially as it applies to a direct applicant as opposed to a collector of tax. The court finds that the Legislature intended to grant the Director rulemaking deference and the court is bound to the guiding[9] language of 54:32B-20(a), and may not infuse its own meaning. Further support for this interpretation is found in N.J.S.A. 54:49-14(a), which provides "[a]ny taxpayer, at any time within four years after the payment of any original or additional tax assessed against him . . . may file with the director a claim under oath for refund, in such form as the director may prescribe . . . (emphasis added).

Solvay cites to Des Champs Laboratories, Inc v. Martin, 427 N.J. Super. 84 (App. Div. 2012) wherein the Court "invalidated an agency['s] rules that added requirements or obligations to a statute without any statutory basis." That case is distinguishable from Solvay. The administrative regulation invalidated in Des Champs Laboratories added stricter requirements than the statute's original language. A governmental agency cannot invoke a regulation that "give[s] a statute greater effect than its language permits." Regent Corp. of Union, Inc. v. Director, Div. of Taxation, 27 N.J. Tax 577, 590 (2014). 54:32B-20(a) does not mention required documentation for refunds, but rather it allocates that role to the Director.

Solvay also cites to In re Adoption of N.J.A.C. 13.38-1.3(f), 341 N.J. Super 536 (App. Div. 2001) and Kamienski v. Board of Mortuary Science, 80 N.J. Super 366 (App. Div. 1963). In both cases the courts invalidated rules because they enacted standards not mentioned in the statute.

---

[9] The DAG conceded on the record during oral argument that the regulations at issue were for guidance purposes only, subject to a reasonableness standard, and were not to be interpreted as strict and absolute for purpose of compliance.

Conversely, 54:32B-20(a) governs sale and use tax refunds. The court assumes the Legislature meant to include every word in the statute. If the Legislature did not intend for the Director to establish regulatory standards, the term "the person shall first establish to the satisfaction of the director, under such regulations as the director may prescribe . . ." would have been left out. Therefore, the regulations in this case are distinguishable from those in cases stated above.

### 2. The Regulations Do Not Contradict N.J.S.A. 54:32B-20(a)

This claim fails because the administrative regulations directly comply with 54:32B-20(a). The court finds that Solvay's argument that "N.J.S.A. 54:32B-20(a) does not state, or even imply, that the director may limit the documentation that taxpayers provide to prove that they erroneously paid tax" is misguided. The statute delegates rulemaking power to the Director generally, and for the purpose of guidance to taxpayers and tax collectors applying for refunds.

Solvay also claims that "subsections (d)(3) and (4) limit the documentation that taxpayers may provide and as a result, the Division rejects taxpayer refund claims unless taxpayers submit specific documentation. This argument also fails; the regulations are structural guidelines, still subject to review by the court in their application. This was conceded at oral argument.   While the Director does provide an extensive list of documentation for refund claims, the list is not absolute and does not contradict 54:32B-20(a). The statute is silent as to any documentation requirements and leaves the Director with the power to address this. Therefore, the rules do not contradict 54:32B-20(a).

### 3. The Regulations Do Not Contradict N.J.S.A. 54:48-3 and 54:32B-46

Solvay's argument that 18:2-5.8(d)(3) and (4) contradict N.J.S.A. 54:48-3[10] and 54:32B-46[11] also fails. Both statutes intend to "simplify" and "unify" the state tax procedures to benefit taxpayers. As explained previously, the court finds that 18:2-5.8(d)(3) and (4) comply with 54:32B-20(a). The court assumes that the Legislature intended for the statutes to work together – not contradict one another.

Solvay's claim that the Director's rulemaking discretion "undermines the Legislature's intent" is unconvincing. The administrative regulations at issue here provide taxpayers with a structured procedure for SUT refunds. For instance, the regulations lay out what documentation is acceptable and how to prove payment of remitted SUT. By establishing this, the Director is providing a simplified and unified procedure for taxpayers to follow. This complies with the legislative intent of 54:48-3 and 54:32B-46.

### 4. The Regulations Are Not Arbitrary and Capricious

Solvay has the burden of proving that the 18:2-5.8(d)(3) and (4) regulations are arbitrary and capricious, or to put it another way, unreasonable and/or irrational. See New Jersey State League of Municipalities v. Dept. of Community Affairs, 158 N.J. 211, 222 (1999); and Bergen Pines County Hospital v. N.J. Dept. of Human Service, 96 N.J. 456, 477 (1984).

---

[10] "The purpose of this subtitle is to provide as far as feasible a uniform procedure to be followed by taxpayers in relation to any state taxes and to afford uniform remedies and procedures which may be resorted to by the state in the collection of any of its taxes." N.J.S.A. 54:48-3.

[11] "The Legislature finds that this State should enter into an Agreement with one or more states to simplify and modernize sales and use tax administration in order to substantially reduce the burden of tax compliance for all sellers and for all types of commerce." N.J.S.A. 54:32B-46.

To determine unreasonableness, a court examines whether: (1) the agency's decision offends the State or Federal Constitution; (2) the agency action violates express or implied legislative policies; (3) the record contains substantial evidence to support the findings on which the agency based its action; and (4) applying legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made based on the relevant factors. George Harms Const. Company, Inc. v. N.J. Turnpike Auth., 137 N.J. 8, 27 (1994).

Until Solvay proves otherwise, the court must assume 18:2-5.8(d)(3) and (4) are valid. See Dougherty v. Dept. of Human Services, Div. of Medical Assistance & Health Services, 91 N.J.1, 6 (1982). There is "a 'strong presumption of reasonableness' . . . accorded to the agency's exercise of its statutorily delegated duties." In re Application of Holy Name Hosp., 301 N.J. Super 282, 295 (App. Div. 1997) (quoting City of Newark v. Natural Resource Council, 82 N.J. 530, 539, cert. denied, 449 U.S. 983 (1980)). Therefore, Solvay must prove that the regulations are arbitrary, capricious, unreasonable, or irrational. To do this, Solvay argues that the Division's actions violate express or implied legislative policies. The Division counters that N.J.S.A. 54:32B-24(4) and (5) provide the Director with the power to implement rules where necessary to interpret the SUT.

Solvay compares their situation to that found in New Cingular Wireless PCS, LLC v. Director, Division of Taxation. 28 N.J. Tax 1 (2014). The New Cingular Wireless PCS case concerned the interpretation of the word "repayment" in 54:32B-20(a). Although this case involves the same statute, the New Cingular Wireless court's opinion is not applicable to Solvay's claim. The existence of 18:2-5.8(d)(3) and (4) do not impose unreasonable obligations on taxpayers. The N.J. Legislature delegated rulemaking power to the Director, and the regulations are not arbitrary and capricious simply because Solvay wants to provide the evidentiary documentation in its own

manner. The regulations provide straightforward requirements to simplify the process for taxpayers. This furthers the legislative intent of N.J.S.A. 54:48-3 and 54:32B-46.

Solvay's claim that the Division failed to meet its burden of refuting Solvay's allegations of arbitrary and capricious is inconsequential. Solvay must first meet their own burden, as the moving party, of proving that the regulations are indeed arbitrary and capricious, and Solvay failed to do so. Therefore, the court finds that the regulations are not arbitrary and capricious.

Finally, Solvay argues that the burden on taxpayers becomes too high because the regulations are archaic and burdensome, and do not comport with modern business practices. Although the burden on taxpayers at times may be high when proving a refund, that was the Legislature's intent, and it is not within the Court's discretion to legislate – the court must only decide if the regulations are valid or invalid.

For these reasons, Solvay's motion for summary judgment on this issue is denied, and the Division's summary judgment motion as to the validity of 18:2-5.8(d)(3) and (4) is granted.

B.   SUT exemptions pursuant to N.J.S.A. 54:32b-8.13(a) cannot be resolved through summary judgment as there are factual issues to be determined.

The exemption provision that Solvay invokes here, N.J.S.A. 54:32B-8.13(a), applies to "[s]ales of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining." Explicitly not exempt, however, are sales of items whose uses are merely "incidental" to production, "parts with a useful life of one year or less," and "tools or supplies used in connection with" items described in the provision. N.J.S.A. 54:32B-8.13.

The Division's applicable regulations define "machinery, apparatus, or equipment" as "any complex, mechanical, electrical or electronic device, mechanism or instrument which is adapted

17

to the accomplishment of a production process, and which is designed to be used, and is used, in manufacturing, converting, processing, fabricating, assembling, or refining tangible personal property for sale." N.J.A.C. 18:24-4.2. Also included within that definition is a working "part" of such machinery, see Panta Astor, Inc. v. Taxation Div. Dir., 8 N.J. Tax 464, 473 (1986), defined as an item used as a replacement for any portion of a machine and is attached or affixed to the machine of which it is a part permanently or during periods of use. A part cannot accomplish the work for which it was designed independent of its machine. N.J.A.C. 18:24-4.2.

A nonexempt "tool" is "a hand-held and manually operated work instrument which is simple in design and used in the performance of simple work functions." Id. Nonexempt "supplies" are items of tangible personal property utilized in the maintenance of a building, work area, or machinery, apparatus, and equipment, and may include items of tangible personal property consumed or employed in uses incidental to production. Supplies include, but are not limited to, items such as lubricants, cleaning materials, boiler compounds and light bulbs. Id.

Finally, insofar as exempt items must be used "directly and primarily" in "production," rather than have a use merely "incidental" to production, N.J.S.A. 54:32B-8.13, the Director's regulations state:

> (b) Production is limited to those operations commencing with the introduction of raw materials into a systematic series of manufacturing, processing, assembling, or refining operations, and ceases when the product is in the form in which it will be sold to the ultimate consumer, and does not include any activities which are distributive in nature. For example, a machine which packs a product into shipping cases after the product is in the form in which it will be purchased by the ultimate consumer is not considered to be used in production.
>
> (c) Machinery, apparatus, or equipment is considered to be directly used in production only when it is used to initiate, sustain or terminate the transformation of raw materials into finished products. In determining whether property consisting of machinery, apparatus

or equipment is "directly" used, consideration must be given to the following factors:

1. The physical proximity of the property in question to the production process in which it is used [;]

2. The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process; and,

3. The active causal relationship between the use of the property in question and the production of a product. The fact that particular property may be considered essential to the conduct of manufacturing, processing, assembling or refining because its use is required either by law or practical necessity does not, of itself, mean that the property is used directly in manufacturing, processing, assembling or refining. For example, property used to prevent accidents, which may be required by law, is not considered directly used.

[N.J.A.C. 18:24-4.4.]

Whether Solvay's purchases of repair parts are exempt from SUT under N.J.S.A. 54:32B-8.13(a) ("54:32B-8.13(a)") is a question of fact. To qualify, the repair parts must fulfill three parts of the statute: 1.) the definition of machinery, apparatus, or equipment; 2.) be utilized directly and primarily in the production of tangible personal property; and 3.) maintain a useful life of more than one year. "Note that the exemption is not lost if the end product is not sold to a final consumer but is used to produce some other tangible personal property." Liscio's Italian Bakery, Inc. v. Dir., Div'n of Tax'n, 31 N.J. Tax 249, 259-60 (2019).

Solvay's repair parts likely meet the definition of machinery, apparatus, or equipment. The statutory definition is quite general, allowing for more parts to qualify. Solvay cites to Liscio's Italian Bakery, Inc. v. Dir., Division of Taxation, which involved determining whether mobile baking racks qualified as "machinery, apparatus or equipment," and Solvay asserts that "pumps,

19

piping, instrumentation, heater/coolers, tanks/vessels . . .. dryers and extruders" are all utilized in the PVDF and Tecnoflon manufacturing process.

If Solvay's purchase of repair parts meets the statutory definition above, the court must also consider whether the repair parts were used primarily and directly in production. Solvay's manufacturing process is a multistep one, involving very technical and scientific parts. The Legislature has not provided a definition for what constitutes "primarily." The Court in Liscio's Italian Bakery, Inc., explained that,

> "if 'a single unit . . . is put to use in two different activities, one of which is a direct use and the other which is not' an exemption is allowed only where the property is used 'more than 50 percent of the time directly in manufacturing, processing, assembling, or refining operations.'"

[Liscio's Italian Bakery, Inc., at 259-60 (2019).]

Whether the repair parts are primarily used in Solvay's production process is unascertainable at this time. The court also acknowledges that Solvay's production process is inherently more complex than the baking production process found in Liscio's Italian Bakery, although that case is certainly helpful to use as guidance.

Next, the court must consider if the repair parts qualify as being directly utilized in the process. While Solvay explains the manufacturing process in detail, there isn't enough information to determine if all three factors are met. Therefore, summary judgment cannot be granted.

Additionally, the Division contends that Solvay did not prove that its repair parts maintain a useful life greater than one year. Solvay contests this, claiming the parts included in the refund request do have a useful life greater than one year. The length of the part's useful life is a material fact. Therefore, both parties' disagreement on this point is a dispute as to a genuine material fact.

Summary judgment cannot be granted for either party when a dispute such as this exists. A trial is necessary to resolve what the useful life is.

                C.        <u>Solvay's use of credits on the July 1, 2011 through December 31, 2013 tax returns.</u>

The Division is correct in asserting that a taxpayer may not unilaterally make the decision upon itself to apply credits against any SUT due. The Legislature allots the Director the power to assess taxes, whether this includes charging or crediting SUT. No New Jersey statute grants a taxpayer the ability to do this.

Solvay defends its actions by claiming that the use tax credits at issue correspond to use tax that Solvay had paid in error, and thus took a credit on its tax returns. Solvay justifies its position relying upon generally accepted accounting principles (GAAP) and Securities and Exchange Commission (SEC) regulations. However, the court must first decide whether any dispute over Solvay's tax credits and the Division's decision to use the credits to offset any refunds is moot as time barred.

The Statute of Limitations ("SOL") for assessments is found in <u>N.J.S.A.</u> 54:32B-27, which states in relevant part "[n]o assessment of additional tax shall be made after the expiration of more than four years from the date of filing of a return . . ." From the statute's plain language, the court concludes that the four years begins to run from the date the return is filed. The Division does not dispute that Solvay's returns were filed between August 20, 2011 and January 12, 2014. Liberally applying the return filing date in the Director's favor, the SOL expired four years from January 12, 2014. The first mention of the use tax credit offset by the Division was at the November 14, 2018 conference, and the formally assessed additional use tax on Solvay occurred on March 19, 2019, both dates of which are outside the SOL deadline, January 12, 2018.

21

The Division argues that the offset did not constitute an additional assessment, rather, the Division simply "reduced the amount of use tax refund due by the unremitted and undocumented credits taken against Plaintiff's use tax accruals." The court disagrees. Since the tax years during which the credits were taken were closed without audit, the allowance of an offset is tantamount to a reopening and audit of closed years. This directly conflicts with N.J.S.A. 54:32B-27 and N.J.S.A. 54:49-6 and would permit the collection of additional tax flowing from closed tax years. Once Solvay's return was filed, the Division maintained the opportunity to assess and reassess all aspects of the return including the use tax credits during the statutory four-year period.

If the Division failed to rectify incorrectly applied credits during the statutory period, it cannot do so in the context of Solvay's refund claim. It is within the authority and timing for the Director to deny a refund request, but not assert an additional assessment based on previously missed use tax credits. As a matter of public policy, any other determination would dissuade taxpayers from requesting a refund. The once symbiotic relationship between a taxpayer and the Division may be harmed in the process.

Furthermore, the court does not accept the Division's argument that the SOL begins to run on the date Solvay filed their use tax refund, July 27, 2015. The statute distinctly uses the phrase "date of filing of a return."

Accordingly. the court denies the use tax credit offset on the basis that it is an untimely additional use tax assessment.

## V. Conclusion

Partial summary judgment is granted in favor of the Division with respect to the validity of N.J.A.C. 18:2-5.8(d)(3) and (4) and denied as to Plaintiff. Partial summary judgment is granted in favor of the Plaintiff and against the Division regarding the offset of SUT refunds with untimely

additional assessments based on use tax credits.  Summary judgment is denied as to all other issues.

A trial is set to last three days and is scheduled for June 22 through June 24, 2022.


/s/ Mary Siobhan Brennan
Mary Siobhan Brennan, J.T.C.